# United States District Court
# District of Massachusetts

No.

———————————————————————
)
JACKIE HOSANG LAWSON, on behalf of herself )
and all others similarly situated,  ) RICO CLASS ACTION COMPLAINT:
)
       Plaintiff,  )
)
v.  )
)
FMR LLC, dba FIDELITY INVESTMENTS,  )
FMR CORP., dba FIDELITY INVESTMENTS,  )
and FIDELITY BROKERAGE SERVICES  )
LLC, dba FIDELITY INVESTMENTS,  )
)
       Defendants.  )
———————————————————————

[1] CIVIL RICO: 18 U.S.C. § 1962(a)

[2] CIVIL RICO: 18 U.S.C. § 1962(b)

[3] CIVIL RICO: 18 U.S.C. § 1962(c)

[4] CIVIL RICO: 18 U.S.C. § 1962(d)

[5] VIOLATION OF THE INVESTMENT ADVISERS ACT OF 1940

[6] VIOLATION OF THE INVESTMENT COMPANY ACT OF 1940

[7] VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

[8] BREACH OF FIDUCIARY DUTY

[9] BREACH OF CONTRACT

[10] BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

[11] VIOLATION OF THE SARBANES-OXLEY ACT OF 2002

[12] VIOLATION OF THE DODD-FRANK ACT OF 2010

[13] VIOLATION OF THE LANHAM ACT

[14] VIOLATION OF MASSACHUSETTS STATE LAWS

[15] VIOLATION OF MASSACHUSETTS GENERAL LAWS

**BENCH TRIAL DEMANDED**

Plaintiff Jackie Hosang Lawson (Ms. Lawson), for her complaint against the Defendants identified as; FMR Corp., its successor, FMR LLC, their subsidiary, Fidelity Brokerage Services, LLC, and all companies operating under the trade name and are referred to herein as Fidelity Investments, alleges on knowledge with respect to herself and her own conduct, and upon the bases of information and belief as to all other matters.

The evidential material supporting this Complaint is substantive, substantial, and self-revealing of the Defendants' and their conspirators' knowing participation in the schemes, cover-ups, and wrongdoings.

This Complaint complies with Fed. R. Civ. Proc. Rule 9. Pleading Special Matters, section (b) Fraud or Mistake; Conditions of Mind. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

Plaintiff Lawson's knowledge and belief are based on, among other things, information culled from two major sources:

1)     **Documents produced by the Defendants 2015 through 2017, in a related litigation, Lawson v. FMR LLC, Civil Action No. 08-10466-DPW - The Massachusetts District Court;**

2)     **FOIA documents produced in November 2018, by The United States Department of Labor / OSHA division.**

Plaintiff Jackie Hosang Lawson (Lawson), on behalf of herself and all others similarly situated, including all people with Fidelity Investments brokerage accounts in the United States, as and for her Complaint against the Defendants, FMR LLC, d/b/a Fidelity Investments; FMR CORP., d/b/a Fidelity Investments; FIDELITY BROKERAGE SERVICES, LLC, d/b/a Fidelity Investments (Fidelity) alleges as follows:

2

## INTRODUCTION

1.      The Defendants - Fidelity Investments, egregiously operates an organized

fraudulent enterprise that is powered by obstruction of justice, witness intimidation, fear of

reprisal, bribery, collusion with The Fidelity Mutual Fund Board of Trustees to defraud

shareholders, and the corruption of two government agencies.

2.      The Defendants' Racketeering Influenced and Corrupt Organizations' Enterprise:

**Fidelity Investments Fraudulent Enterprise** ("The FIFE"), exists for a common purpose - to

cover-up past, recent, and current crimes. Concertedly, to cover-up major corporate malfeasance,

and, to evade federal government investigation, thus, enabling the Defendants' continuation of

defrauding shareholders out of billions of dollars in excessive account servicing fees, reaped

from an insidious Mass-Marketing Fraud; the causation for the creation of the FIFE.

3.      The causation of this RICO Class Action Complaint is compelling . . . billions of

dollars in illegal and unwarranted profits.

4.      Fidelity Investments; the world's largest mutual fund firm, is a privately held, for

profit firm, that is owned and controlled by the Johnson family. The controlling Johnson family

members, previously, Chairman Edward Johnson III, and, currently his daughter Abigail Johnson

are also the controlling members of the FIFE, and according to Forbes Business Magazine are

two of the richest people in the United States, with personal wealth valued in the billions of

dollars. During the relevant period, the Johnson family substantially control the management and

conduct of the Defendants.

5.      The Johnson's family primary enrichment comes from the operation of the

privately held company, Fidelity Investments, whose main revenue sources are monthly fees

collected from the Fidelity Funds for: (1) Management of the Fidelity Funds; (2) Servicing of shareholder accounts.

6.     The Fidelity Funds are registered public corporations, and although created and operated by Fidelity Investments, are not owned by the Johnson family, but instead are owned by the shareholders of the Fidelity Funds who pay monthly fees, including the fees for the servicing of accounts, to the privately held company; Fidelity Investments.

7.     The Defendants operates the Fidelity Funds through three major annual contractual agreements . . . including the servicing of accounts contract . . . **The Transfer Agent Agreement** contract, which is the relevant contract associated with this RICO Class Action lawsuit. The Transfer Agent Agreement contract rates are approved and renewed annually in November, by the Fidelity Mutual Funds Board of Trustees.

8.     Both Fidelity Investments, and The Fidelity Mutual Funds Board of Trustees ("The Board"), pursuant to securities laws governing the mutual fund industry, owe fiduciary duties to the true owners of the Fidelity Funds; the Fidelity Funds' shareholders. These legal duties mandate that Fidelity and The Board must put the interests of the true owners; the shareholders, before the interests of the Defendants, who operates the Fidelity Funds on behalf of the shareholders.

9.     The Board violates their owed fiduciary duty to the Fidelity Fund's shareholders by allowing the Defendants to operate, and reap profits from the Mass-Marketing Fraud.

10.     The Defendants operates a Mass-Marketing Fraud, specifically: "(1) Schemes that defraud numerous victims out of comparatively small amounts, such as several hundred dollars, per victim." The United States Department of Justice excerpt on "Mass-Marketing Fraud" is attached hereto as Exhibit 1.

11.     Former Fidelity Investments senior executive, Steve Jonas . . . prior direct report to Chairman, Edward Johnson III . . .  testified on November 02, 2017, that the privately held company Fidelity Investments collects "**$12 billion plus of revenue**," and makes "**$2 billion worth of profit.**" That is; $2 billion dollars every year in "**pure profits**" after all expenses are paid, annually increasing the already staggering wealth of the Johnson family. A significant amount of the "**$2 billion worth of profit**," is derived from cheating their shareholders through the operation of the Mass-Marketing Fraud. Mr. Jonas' testimony transcript excerpt is attached hereto as Exhibit 2-5.

12.     The Fund Profitability Operating Margins for the Fidelity Brokerage Company was 31.1% and 32.3% for 2005, and 2006, respectively. In violation of their fiduciary duties . . . to achieve such lucrative results . . . members of the FIFE conspiracy rig the system so that the Defendants are at the top of the food chain; collecting their illegal profits first, ahead of the Fidelity Funds' shareholders, whose interests, by fiduciary law, should come first.

13.     The Mass-Marketing Fraud, and the associated methodology used to allocate its operating costs on the profit and loss statements, enables Fidelity Investment to fraudulently collect excessive monthly account servicing fees from the Fidelity Funds, which have a long-term adverse impact on shareholders' returns.

14.     On May 07, 2008, the Defendants acknowledged the Mass-Marketing Fraud's impact on shareholders' returns in a "<u>MEMORANDUM IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS FMR LLC AND FIDELITY BROKERAGE SERVICES LLC</u>"

> **"Sarbanes-Oxley was intended to address fraud by public companies against their shareholders. In this case, there is no allegation of fraud by a public company. On the contrary, what Lawson evidently intends to allege is, at most, that a subcontractor exaggerated its costs in a manner that caused a public company – the Funds – to overpay for the subcontractor's services. Self-evidently, however, "shareholder fraud" does not include overcharging a**

**public company on a contract, <u>even if that overcharge ultimately affects the value of shareholders' holding</u>."**

A copy of this memorandum, with the relevant statement on page 11, is attached hereto as Exhibit 6-25.

15.     Ms. Lawson in her claims, promulgated the Defendants' surface offense; charging excessive service fees. The Defendants, by fleshing out the impact of charging excessive service fees in the May 07, 2008, memorandum, acknowledges Fidelity Investments' knowing duplicity towards their shareholders, which is a well acknowledged fact in the mutual fund industry; the adverse impact of excessive fees on long-term investor returns.

16.     The genius of the Mass-Marketing Fraud is its invisibility to the individual shareholders. The monthly fees for servicing of shareholder accounts are not collected from each individual shareholder, but instead, are collected in aggregate from the Fidelity Funds.

17.     The aggregate fee-charging arrangement, and its lack of transparency to the individual account holders, provides the Defendants the cloak to bilk the Fidelity Funds' shareholders.

18.     The Plaintiff has extensive knowledge of Fidelity Investments' account service fee-charging structure. As Fidelity Brokerage Company's Transfer Agent Fee Custodian, one of Ms. Lawson's management responsibilities included monthly approval of the number of assets, and the number of accounts, used to determine the monthly revenue for various Fidelity businesses, including Fidelity's flag ship mutual fund company; the retail organization.  This particular responsibility of Ms. Lawson is evidenced and attached hereto as Exhibit 26-32.

19.     Fidelity Investment optionally chooses to service the accounts of the Fidelity Funds' shareholders . . .  dually acting as the Fidelity Funds Transfer Agent . . . in addition to their primary role as the investment adviser of the Fidelity Funds.

20.     The Johnson Family by optionally choosing to act as the Transfer Agent for the Fidelity Funds, versus outsourcing that function . . . an option that would limit conflicts of interest . . . places Fidelity Investments in a predatory subcontractor position, allowing Fidelity Investments the opportunity to capitalize on, and effectuate, their advantage as the proverbial fox guarding the hen house, as the Defendants acknowledged in their May 07, 2008 memorandum.

21.     The Defendants' self-serving business structure, promoting the erosion of Fidelity Investments' owed fiduciary duties to their shareholders, allows Fidelity Investments to fraudulently allocate a significant portion of Distribution operation costs to their shareholders, disguised as a cost for servicing of their accounts, enabling Fidelity to collect billions in excessive servicing fees over the relevant period, through the lucrative servicing contracts approved by the Fidelity Mutual Funds Board of Trustees; a Board previously headed by Edward Johnson III, and currently headed by Abigail Johnson.

22.     Mr. Jonas' November 02, 2017, testimony included his disagreement with the Chairman; Mr. Johnson, about paying back questionable fees to the Fidelity Funds: "**And the determination was made by the Chairman of the Board, Mr. Johnson, that it was not clear at that point that it should be returned to the funds, and the decision was made, which is his prerogative as Chairman of the Board, not to return those fees to the funds**." (Two in-house attorneys also advised the repayment of these fees) Ms. Jonas' testimony transcript excerpt is attached hereto as Exhibit 33-40.

23.     Mr. Jonas' statement emphasizes the disturbing immoral construction of the Fidelity Mutual Fund Board of Trustees, which inherently creates conflicts of interests. Mainly, that the head of the privately held firm is also the head of the Board of Trustees, whose main

7

duties are to protect shareholders' interests against abuse of the privately held company such as the charging of excessive fees.

24.     Ms. Lawson, performing her rightful duties as supervisor of Fidelity Brokerage Company's regulatory 15(c) Process; described herein, challenged, and subsequently reported business practices that constitutes securities fraud against shareholders.

25.     Ms. Lawson's major complaint and the causation of her whistleblower activism stems from her strong opposition to a fabricated methodology . . . its creation, its implementation, its validity. This questionable methodology allows Fidelity Investments to overcharge for trumped-up services that are not covered under the servicing contract.

26.     Ms. Lawson reported this fraud first to Fidelity Investments' general counsel, then later to the United States Department of Labor, and the United States Securities Exchange and Commission. Ms. Lawson's June 6, 2007, Memorandum <u>Excessive Transfer Agent Fees – "Guidance Interactions"</u> is attached hereto as Exhibit 41-50. The Defendants acknowledgment of Ms. Lawson's reported claims are attached hereto as Exhibit 51-53.

27.     The methodology in question is used for allocating the operating costs for giving investment advice to the public, and does not fairly allocate costs to the Fidelity Funds, as promised by the Defendants in Fidelity Investments' Annual Fund Reports to shareholders.

28.     The "Guidance" methodology was underhandedly changed for two purposes, (1) to artificially lower the profit margins on the Profit and Loss statements for the servicing of accounts, and (2) influence the end-users of the Profit and Loss statements; The Fidelity Mutual Fund Board of Trustees.

29.     The relationship between the methodology for giving investment advice, and the Mass-Marketing Fraud is intertwined.

30.     The methodology challenged by Ms. Lawson, belies Fidelity's claim that certain offering of investment advice to the public. . . is "free" as widely advertised by Fidelity Investments. The Defendants' misrepresentation of "free" investment advice to the public, in a media blitz, including television commercials and newspaper ads, fuels the Mass-Marketing Fraud.

31.     The Defendants' aggressive marketing campaign of "free" investment advice is used as bait to lure unsuspecting customers to use Fidelity's Brokerage Platform to conduct business, then the Defendants allocate a significant portion of the operating cost of the "free" investment advice to the shareholders on the back-end as services, services that the Fidelity Mutual Fund Treasury group disagreed is covered by the servicing contract.

32.     After Ms. Lawson's exhaustive eight-year journey through federal courts, in 2014, The United States Supreme Court ruled that all mutual fund firms in the United States, including Fidelity Investments are covered entities under The Sarbanes-Oxley Act of 2002, providing whistleblower coverage for all mutual fund companies' employees.

33.     The Supreme Court's 2014, ruling paved the path for this Complaint, giving prominence to Fidelity's acknowledgement of the ultimate impact of their alleged fraud on their shareholders, at a time when Fidelity Investments in their acknowledged subcontractor role to the Fidelity Funds, was hiding behind the company's privately held status to evade coverage under SOX.

34.     The proliferation of securities violations, the depravity of the predicate offenses committed by the FIFE that is enumerated and described below, and the extreme lengths that the Defendants go to cover-up their wrong doings, emphasizes what is at stake; the enormity of the illegal profits that Fidelity fraudulently continues to receive from the Fidelity Funds.

35.     Fidelity Investments also hides scrutiny of its unfair business practices through illegal enforcement of mandatory employee signed Confidentiality Agreements, and Contracts of Adhesions, strengthening the "Corporate Code of Silence," allowing the Defendants to evade justice and to continue operating the Mass-Marketing Fraud.

36.     Ms. Lawson, in December 2006 . . . after Fidelity responded to her internally reported concerns with retaliatory acts, deliberately creating human resource's issues, and sanctioning an ensuing brutal retaliation campaign. . .  sought protection from the Department of Labor charged with protecting whistleblowers such as Ms. Lawson. Ms. Lawson brought further action in Federal court in March 2008, after the Defendants corruptly interfered with a scheduled OSHA investigation into Ms. Lawson's claims as described herein.

37.     Ms. Lawson also reported her concerns to the Securities and Exchange Commission (SEC), who in collusion with the Defendants, turned a blind eye to prohibitions that the regulators specifically placed on Fidelity Investments . . . as acknowledged by Fidelity insiders. Fidelity insider's acknowledgement of the regulator's prohibition related to a SEC no-action letter is attached hereto as Exhibit 54-61.

38.     This further action in federal court is of major importance to all Fidelity Investments' employees; current and former, including Ms. Lawson; all United States employees promised constitutional rights by the two government agencies named in this Complaint, and the millions of Americans with Fidelity Funds brokerage accounts who are unknowing victims of the Defendants' Mass-Marketing Fraud.

39.     Accordingly, Ms. Lawson brings this class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b) (2) and 23(b) (3), as a catalyst for change; seeking monetary, declaratory, and injunctive relief for herself and the class she seeks to represent, consisting of all

individuals in the United States who have been victimized by the Defendants fraudulent media blitz, false and deceptive trade practices, excessive fee charges, and unfair competition practices.

## JURISDICTION

40.     This action arises under the laws of the United States, in particular, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. in violation of multiple federal laws, rules and regulations of the Securities and Exchange Commission, and various state laws, relating to fraud against Fidelity's mutual fund shareholders, including former Fidelity insider Ms. Lawson. Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1964, and 18 U.S.C § 1961 et seq.

41.     This Court has further jurisdiction over the parties and the subject matter of this class action pursuant to 28 U.S.C. § 1332 because there is Diversity of Citizenship between members of the class and the Defendants; and the amount in controversy exceeds $5 million, exclusive of interests and costs.

42.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) as those claims are so related to the federal claims in this action that they form part of the same case or controversy.

## VENUE

43.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b) because this is a civil action in which a substantial part of the events or omissions given rise to Plaintiff's claim occurred in this District. Also, pursuant to 18 U.S.C. § 1965, including but not limited to, that the Defendants transacts business in this district, and other parties residing in other districts may be brought before this Court.

## PARTIES

44.     Plaintiff is a natural person at all times relevant to this complaint residing in the Town of Brookline, in the state of Massachusetts. The Plaintiff, Ms. Lawson, is a former employee of FMR Corp.; currently FMR LLC, and its subsidiary Fidelity Brokerage Services, LLC.

45.     Defendant FMR LLC is a limited liability company organized under the laws of Delaware and registered to do business in the Commonwealth of Massachusetts in the general character of "parent company."  The company's headquarters is Boston, MA.   FMR LLC is the survivor and merger of Defendant FMR Corp. FMR LLC conducts business under the name "Fidelity Investments."

46.     Defendant FMR Corp. is a Delaware corporation and, prior to 2007, was registered to do business in the Commonwealth of Massachusetts in the general character of "parent company of Fidelity subsidiaries" and with its principal offices in Massachusetts located at 245 Summer Street, ZW9A, Boston, MA 02110, and head office at 200 Seaport BLVD, Boston, MA 02210. FMR Corp. conducted business under the name "Fidelity Investments" until its merger into FMR LLC.  FMR Corp. is no longer registered to do business in the Commonwealth of Massachusetts.

47.     Defendant Fidelity Brokerage Services, LLC is a limited liability company organized under the laws of Delaware, and registered to do business in the Commonwealth of Massachusetts in the general character of investments.  Its principal office is 245 Summer Street, ZW9A, Boston, MA 02110, and main address at 900 Salem Street, Smithfield, RI 02917 and head office at 200 Seaport BLVD, Boston, MA 02210.   Fidelity Brokerage Services, LLC conducts business under the name "Fidelity Investments."  Fidelity Brokerage Services, LLC's sole member is Fidelity Global Brokerage Group, Inc., a Massachusetts corporation, with a business in the general character of "investments" and a principal office in Massachusetts at 245 Summer Street,

ZW9A, Boston, MA 02110.   Fidelity Global Brokerage Group, Inc., is a wholly owned subsidiary of FMR Corp. and/or FMR LLC.

## RELEVANT TIME PERIOD

48.     The Defendants' racketeering conduct at issue and relevant to this complaint began in, or about, January 2006, and continues to date.

## FACTUAL BACKGROUND

49.     Plaintiff Jackie Hosang Lawson, is a former exemplary long-term employee of Fidelity Investments and a Fidelity Funds shareholder with an investment portfolio in 2007, valued at over half a million dollars, invested in approximately twenty Fidelity Funds.

50.     Ms. Lawson's insider status and work experience, including supervisor of Fidelity Investments retail organization's Fund Profitability analysis, which is a part of the Securities Investment Act of 1940, 15(c) Process described herein, uniquely provides the Plaintiff the knowledge to communicate the sophisticated Mass-Marketing Fraud perpetrated by Fidelity Investments.

51.     Ms. Lawson's expertise is highlighted in her review for the period July 1, 2003 through June 30, 2004:

> "Jackie is a subject matter expert and viewed as such by everyone.  She's committed to producing quality work and is passionate about doing the right thing for business and putting Fidelity first.  She is forward thinking, innovative and always looking to learn and improve.  She has demonstrated leadership with her staff and her finance peers.  Jackie excels at fixing problems.  She has recently demonstrated this yet again by taking it upon herself to understand [Fund Profitability], what was wrong with it and what's needed to be done to fix it.  The NF and RIA businesses are thrilled and appreciative that she is leading this effort.  Jackie has solicited help from CFIT and has developed a project plan which she will lead in order to fix FP."

52.     The terminology "Subject Matter Expert" is a Fidelity nomenclature used categorically by the corporation to label certain employees with expertise in certain areas of finance.

53.     Ms. Lawson's professional designation as a "Subject Matter Expert" . . . assigned to her by Fidelity Investments . . . for various areas of finance support, and discipline, including; (1) Cost Accounting; (2) Fund Profitability Analysis; (3) Transfer Agent Billing Framework and Analysis; (4) Fidelity's Brokerage Technology Platform, uniquely provides Ms. Lawson the qualification to communicate the sophisticated Mass-Marketing Fraud perpetrated by Fidelity Investments.

54.     Ms. Lawson's exemplary work ethic is highlighted in her December 2004 review:

"Jackie is well-respected among her peers and business partners, has an extremely strong work ethic, and can be depended on to get results. She has a lot of knowledge about Fidelity and finance, and shows her concern for both the firm and its people. She is a strong manager who is well-liked and well-respected by the analysts in her group, and she puts a lot of work into developing her people and looking out for their best interests. She is an excellent role model for analysts as well as directors in terms of management, leadership and commitment to achieving results. She is very focused on working collaboratively and building strong relationships with our business partners, whether it is business unit finance, FMR Co. finance or PWC. Jackie is very comfortable presenting to Sr. Mgt. I very much enjoy working with Jackie and look forward to continuing our strong relationship and helping her achieve success in 2005."

55.     Ms. Lawson's following review in July 2005:

In the past year Jackie has been placed in a new role managing Board Support for all of FBC. Jackie had never before been in a role where she was required to perform analysis of the Board of Trustees, so being asked to manage a group of analysts who performed this work without having done it herself was a big challenge. Jackie met this challenge by achieving excellent results for both FP and TA. The feedback that we received from PwC and FMR Co. was that the analysis provided by her group was the best of any business unit, after been the worst the prior, before our group existed. A survey my manager conducted showed that all GBC b/u's [business units] and FMR Co. rated the work provided by Jackie's group in the Annual FP [Fund profitability] cycle very highly. Jackie consistently put in an outstanding effort in all aspects of her role in the past year, working many long

nights and weekends. She has learned a significant amount about Fund Profitability and the Transfer Agent process, and has been an excellent manager of her group. She has made significant improvements to the FP and TA processes for both RIA and NF, one of the key wins from having this work performed in Shared Services."

56.     Ms. Lawson's high competency level as a Financial Analyst is confirmed by CFOs Harris Komishane on November 02, 2017: **Q.** "You also complimented Jackie on her outstanding analytical skills and for being a superior performer." **A.** "I don't recall but I very well might have." **Q.** That certainly reflects your belief and understanding of Jackie Lawson at that point in time, doesn't it?" **A.** "Yes." Excerpts of Mr. Komishane's testimony is attached hereto as Exhibit 62-67.

Ms. Lawson's dedication is confirmed by the external auditors, PricewaterhouseCoopers' partner testimonial on her last day of employment at Fidelity. **"Jackie, you will be missed. Thank you for all your hard work over the last few years."** Mr. Trerice's email is attached hereto as Exhibit 68.

57.     Ms. Lawson's staff member, Erik Olsson, who worked primarily on Transfer Agent analysis, commented to human resources senior manager, Linda Stephenson, three days after Ms. Lawson's departure from Fidelity Investments: "**The knowledge Jackie took with her about the work I am assigned to will undoubtedly leave a mammoth gap.**" Mr. Olsson's email to Linda Stephenson is attached hereto as Exhibit 69-70.

58.     The Plaintiff's primary responsibility for the relevant time period was supervising a team of financial analysts, working closely and partnering with several groups, FMR Co. Board Support Group, Business Finance Groups, Fidelity Corporate Finance, Fidelity Fund Treasurer's Office, Fidelity Technology Group, and the external auditors, PricewaterhouseCoopers (PwC), to manage the Fidelity Brokerage Company Securities Exchange and Commission regulatory required Fund Profitability 15(c) Process.

59.     Fidelity Investments, at the time of Ms. Lawson's employment comprised of three distribution channels, "(i.e. Fidelity Brokerage ["FBC" or "Retail"], Fidelity Employer Services Company ["FESCO." or "Retirement"], and Fidelity Institutional Investment Services ["FIIS" or "Intermediary"]."

60.     Fidelity Investments is a registered investment adviser.

61.     Fidelity Investments' central Board Support Group; **FMR Co.** Board Support Group, who presented profitability results to the Fidelity Mutual Fund Board of Trustees, was under the supervision of JS Wynant, and John Farinacci, during Ms. Lawson's employment.

## SECTION 15(c) OF THE INVESTMENT COMPANY ACT OF 1940 (The 15(c) Process)

Section 15(c) mandates that mutual fund directors must request and evaluate, and the fund's adviser must furnish, information that may be reasonably necessary for the directors to assess the terms of a fund's advisory agreement, known as the "15(c) process." The board should consider the following factors, commonly known as Gartenberg factors, in its evaluation:

- The adviser's cost of providing services to the fund
- The nature and quality of the adviser's services
- The extent to which the adviser realizes economies of scale as the fund grows in assets
- The profits the adviser receives from the fund
- Fee structures for comparable funds
- Any fall-out benefits accruing to the adviser or its affiliates

## THE FIDELITY FUNDS' ANNUAL REPORTS MAKE ASSURANCES AND PROMISES REGARDING THE FAIRNESS OF PROFITS IN RELATION TO THE FUND PROFITABILITY METHODOLOGY PROCESS

62.     The Defendants makes false and misleading statements, representations, and promises in the Annual Fund Reports.

63.     The Annual Fund Reports to the Shareholders of the Fidelity Funds are filed with the Securities and Exchange Commission pursuant to Section 30(b)(2) of the Investment

Company Act as amended, 15 U.S.C. § 80a-30(b)(2), and Section 15(d) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78o(d).

64.     The 2008 Annual Report of Fidelity Puritan Fund contains a section entitled

"Board Approval of Investment Advisory Contracts and Management Fees." One subsection is

entitled "Cost of the services and Profitability." In that subsection, the Annual Fund Reports

states:

> The Board considered <u>the revenues earned and the expenses incurred</u> by Fidelity in conducting the business of developing, marketing, distributing, managing, administering and servicing the fund and its shareholders. The Board also considered the level of Fidelity's profits in respect of all the Fidelity funds.
>
> On an annual basis, FMR presents to the Board Fidelity's profitability for the funds. Fidelity calculates the profitability for each fund, as well as aggregate profitability for groups of Fidelity funds and all Fidelity funds, using a series of <u>detailed revenue and cost allocation methodologies</u> which originate with the audited books and records of Fidelity. The Audit committee of the Board reviews any significant changes from the prior year's methodologies.
>
> PricewaterhouseCoopers LLP (PwC), independent registered accounting firm and auditor to Fidelity and certain Fidelity funds, has been engaged annually by the Board as part of the Board's assessment of the results of Fidelity's profitability analysis. PwC's engagement includes the review and assessment of Fidelity's methodologies used in determining the revenues and expenses attributable to Fidelity's mutual fund business, and completion of agreed-upon procedures surrounding the mathematical accuracy of fund profitability and its conformity to allocation methodologies. After considering PwC's reports issued under the engagement and information provided by Fidelity, <u>the Board believes that while other allocation methods may also be reasonable, Fidelity's profitability methodology are reasonable in all material respects.</u>
>
> The Board also reviewed Fidelity's non-fund businesses and any fall-out benefits related to the mutual fund business as well as cases where Fidelity's affiliates may benefit from or be related to the fund's business.
>
> The Board considered the costs of the services provided by and the profits realized by Fidelity in connection with the operation of the fund and <u>determined that the amount of profit is a fair entrepreneurial profit for the management of the fund.</u>

65.     On information and belief, the Annual Fund Reports for all Fidelity mutual funds contains similar disclosure.

66.     On August 02, 2007, the Plaintiff's securities attorney, John Dougherty, wrote to the Defendants, addressing the "Cost of the services and Profitability" section in the Annual Fund Reports, in regards to Ms. Lawson's beliefs of "violations of SEC rules and regulations by Fidelity."

> "**She believes, for the reasons stated in the memoranda she previously submitted to Fidelity, that the statements and assurances in the Annual Fund Reports are false and misleading in that they do not disclose that incorrect information was submitted to the Boards, that some methodologies approved by the Boards were not implemented, and that other methodologies were implemented without being approved by the Boards**."

An email to Ms. McSwain and her reaction is attached hereto as Exhibit 71-75.

## THE FIFE'S CORRUPTION OF THE UNITED STATES DEPARTMENT OF LABOR / OSHA

67.     The Defendants went to great lengths to stop any substantive investigation into the Plaintiff's claims described herein, that would most likely have led to the discovery of the Mass-Marketing Fraud, and could have possibly ended the illegal practice, and protect the Class Members from deceptive business practices, and excessive service fees.

68.     The Department of Labor neglected their promised duty and violated their constitutional duties by failing to conduct a scheduled investigation.

69.     Over a one-year period, between December 2006, and November 2007, Ms. Lawson's attorney submitted four claims against the Defendants on the Plaintiff's behalf to the United States Department of Labor.

70.     On December 20, 2006, a claim was made under section 806 of the Criminal and Corporate Fraud Accountability Act, The Sarbanes-Oxley Act of 2002,18 U.S.C. §1514A,

alleging securities fraud that Ms. Lawson reported internally, and the ensuing retaliation by the
Defendants.

71.     On April 24, 2007, the second claim was filed, largely reporting further retaliation
directed at Ms. Lawson once she had completed an investigation into the questionable
methodology used to allocate investment advice costs to the Fidelity Funds, and escalated her
findings to the SEC, and to superiors above her immediate bosses – Harris Komishane and Claire
Cadogan.

72.     On August 10, 2007, securities attorney John Dougherty, submitted a supplement
to the DOL pertaining to OSHA's jurisdiction over Ms. Lawson's claims, stating further SEC
violation committed by the Defendants: "**It would also mean that the statements in the
Fidelity Funds Annual Fund Reports were false and misleading, among other things**."

73.     In the same correspondence to OSHA attorney Dougherty urged OSHA, "**In
closing, we must express our concern that Fidelity is making meritless jurisdictional
arguments in order to drain the resolve and financial resources of Ms. Lawson. OSHA
should not countenance such behavior. Ms. Lawson has made much more than a prima
facie case regarding jurisdiction. It is time for this case to move forward.**"

74.     On September 14, 2007, a third, more comprehensive reporting of the securities
fraud mentioned in the first two complaints, was filed against the Defendants, incorporating the
formal internal complaints Ms. Lawson reported to Fidelity's general counsel's office.

75.     On November 9, 2007, a fourth and final claim was filed regarding Ms. Lawson's
constructive discharge on September 21, 2007. This final complaint narrated the brutal retaliation
Ms. Lawson experienced just prior to Ms. Lawson's forced resignation. The complaint also
included a "Summary of Allegations."

76.     Ms. Lawson's claims were addressed to Marthe B. Kent at the U.S. Department of Labor, Occupational Safety & Health Administration (OSHA.)

77.     Carole Horowitz, Regional Supervisory Investigator, acknowledged receipt of Ms. Lawson's claims.

78.     OSHA investigator Kristen Rubino from the Boston office was assigned to Ms. Lawson's case.

79.     On or about September 10, 2007, almost nine months after Ms. Lawson's first complaint, OSHA notified all parties that the Defendants were covered entities under The Sarbanes-Oxley Act of 2002.

80.     On September 20, 2007, Ms. Rubino officially notified outside counsel, Eugene Scalia, to set up interviews "of the Fidelity management staff." On October 03, 2007, Ms. Rubino also confirmed with the Plaintiff's attorney that Ms. Rubino had scheduled an investigation into Ms. Lawson's claims, giving a specific date in November 2007, for the commencement of the investigation. Ms. Rubino's emails to attorney Scalia are attached hereto as Exhibit 76-78.

81.     Sometime after October 19, 2007, Ms. Rubino notified the Plaintiff's attorney that the Lawson case had been put on hold indefinitely, and, that the November scheduled investigation had been cancelled. The only explanation provided by Ms. Rubino was that the order to put the case on hold indefinitely, came from the highest level in Washington D.C.

### THE FIFE'S INTERFERENCE WITH A SCHEDULED GOVERNMENT AGENCY INVESTIGATION

82.     On November 14, 2018, the Plaintiff received FOIA documents showing that FIFE conspirators, attorney Eugene Scalia, and members of the Defendants' general counsel

office acting on behalf of the FIFE, corruptly interfered with a scheduled government investigation.

83.     Mr. Scalia had *ex-parte* communications with Nilgun Tolek in Washington D.C. starting September 14, 2007, ***after*** OSHA informed all parties that the Defendants were covered entities under The Sarbanes-Oxley Act of 2002.

84.     On September 14, 2007, Carole Horowitz asked Ms. Tolek: "**Based on your conversation with Scalia, do you see any reason why Kristen should hold off on interviewing witnesses in this case?**" Ms. Tolek response: "**No. I don't think he'll be able to convince us to back off. I'm hoping instead to simply convince him that we're not nuts.**"

85.     On September 26, 2007, attorney Scalia continued *ex-parte* communications with Ms. Tolek, scheduling a time for attorney Scalia and his clients, to meet with Ms. Tolek; <u>Subject: "RE: Redux: Fidelity/Lawson."</u>

86.     On October 2, 2007, @ 3:59 PM, Ms. Tolek notified attorney Scalia, "All of us are available on the 19th, and on the 10th, it would need to be before 10 or after 3. My only concern is that the 19th is so far away, and **the investigation needs to move forward**…."

87.     On October 2, 2007, @ 4:13 PM, attorney Scalia responded asking Ms. Tolek to reserve the 19th, further stating "—I appreciate your point about **the investigation** – but it turns out that date does not work for an **<u>important representative</u> of the client**."

88.     The "Meeting with Scalia" and the "**important representative of the client**" was scheduled for October 19, 2007 at 1:00 PM.

89.     Shortly after attorney Scalia's October 18, 2007, meeting with Ms. Tolek, and the expected attendance of the aforementioned "**important representative of the client,**" the

Plaintiff's attorney was informed by Ms. Rubino that the Lawson investigation was put on hold indefinitely.

90.     There is no record in the OSHA produced FOIA files as to the identity of the "**important representative of the client**" who attended the October 19, 2007, meeting in Washington D.C. with Ms. Tolek.

91.     On December 20, 2007, the Plaintiff's attorney wrote to Steven J. Mandel, Associate Solicitor, Office of the Solicitor, and concluded:

> "Ms. Lawson attempted here what Congress hoped for in passing Sarbanes-Oxley. As an insider with information concerning possible fraud against the shareholders of Fidelity Investments, she attempted to bring her concerns to her superiors, Fidelity's General Counsel and to the Securities and Exchange Commission. She had an unblemished record for over a decade of service to Fidelity Investments when she took these steps. When Fidelity Investments began retaliating, she thought help from OSHA. A year later, however, she has been forced out of her position, and Fidelity Investments has successfully avoided any substantive investigation into her claim.

> "At this juncture on her behalf, **I respectfully request that OSHA continue its investigation of her claim and afford her the protection promised by Congress.**"

92.     OSHA, copied on the communication to Mr. Mandel, did not respond to the plea for help in Ms. Lawson's plight, and the Plaintiff was left with no other recourse but to file a civil complaint in the Massachusetts federal district court, which she did in March 2008.

93.     On May 7, 2008, in response to the Plaintiff's civil complaint, the Defendants filed a "MEMORANDUM IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS FMR LLC AND FIDELITY BROKERAGE SERVICES LLC," in which the Defendants misrepresented to this Court: "Lawson resigned from her employment and declared herself constructively discharged. Shortly thereafter, **Lawson asked OSHA to cease its investigation of her case and dismiss her complaints** so she could proceed with this action in federal court pursuant to 18 U.S.C. § 1514A(b)(1)(B).

94.     The above statement is an apt representation of the many half-truths, false statements, and misstatements to this Court; other federal courts; the press; the jury during the Lawson trial in 2017, by the Defendants and the FIFE conspirators.

The communications between attorney Scalia and the DOL are attached hereto as Exhibit 79-105.

## OSHA'S COLLUSION WITH THE FIFE

95.     On January 25, 2008, OSHA issued a Memorandum regarding Ms. Lawson's complaint against the Defendants: "**Before OSHA issued Secretary's Findings deciding on the jurisdiction issue, Complainant withdrew her complaint from OSHA and removed the case to Federal District Court**." However, OSHA had already decided and communicated jurisdictional coverage to all parties around September 10, 2007, and OSHA makes no mention that the agency itself put the Lawson investigation on hold indefinitely, and cancelled the scheduled investigation; actions which forced Ms. Lawson to pursue justice in the District Court, and an important omission of facts in the memorandum.

96.     On September 04, 2007, Nilgun Tolek wrote Carole Horowitz, Kristen Rubino, and others at OSHA: "**Scalia may argue that only employees of the covered company are protected from retaliation by the contractor, ---, but we have so far taken the opposite— that the contractors and subs themselves are covered, and thus their employees are covered.**"

97.     Nilgun Tolek further confirmed coverage in her email to Kristen Rubino on September 14, 2007 @ 2:40 PM, discussing attorney Scalia, "**He was taken aback by our analysis.**"

98.     Ms. Tolek again confirmed coverage to Carole Horowitz @ 3:54 PM on September 14, 2007, "**Based on your conversation with Scalia, do you see any reason why Kristen should hold off on interviewing witnesses in this case?**" Ms. Tolek responded: "**No. I don't think he'll be able to convince us to back off. I'm hoping instead to simply convince him that we're not nuts,**" further negating the January 25, 2008 memorandum.

99.     On October 2, 2007, Ms. Tolek notified attorney Scalia, "All of us are available on the 19th, and on the 10th, it would need to be before 10 or after 3. My only concern is that the 19th is so far away, and **the investigation needs to move forward**…." again negating the January 25, 2008 memorandum.

100     OSHA held back critical information regarding the investigation in the FOIA document production. OSHA did not produce the email from Ms. Rubino to attorney Scalia on October 3, 2007, regarding the cancelled investigation: "**Mr. Scalia, At this point I want to interview Harris Komishane, Claire Cadogan, Jean Raymond, Dick Lyons, and possibly Mike Freeman.**" One other email regarding the scheduled investigation, was not produced not by OSHA in response to Ms. Lawson's FOIA request.

101.    On October 18, 2007, in communications with Nilgun Tolek, Ms. Horowitz prophetically stated: "**I have a hunch that if we continue to find that Fidelity is covered, they will try to settle with Lawson now that she has resigned. They will not want this decided against them**."

102.    OSHA's negligence constitutes a breach of duty by a government agency mandated to provide protection to employees like the Plaintiff, whom OSHA left out in the cold. OSHA's aborted duty to Ms. Lawson is much more than harm done to just one individual. OSHA's aborted duty taints the democratic process of the United States as to constitutional

rights promised to employees by the government that was forsaken for concessions made to a big corporation; Fidelity Investments.

103.     There was no interference with the Defendants' other employee, Jonathan <u>Zang</u>'s DOL Sarbanes-Oxley complaint against Fidelity Investments, which unlike Ms. Lawson's situation, was allowed to proceed through OSHA's normal investigative process.

104.     The "**important representative of the client**" was sufficiently tooled with powerful political clout to suppress a scheduled government investigation.

The relevant FOIA documents produced by OSHA are attached hereto as Exhibit 106-117.

<b><u>THE FIFE'S CORRUPTION AND COLLUSION WITH THE<br>UNITED STATES SECURITIES AND EXCHANGE COMMISSION</u></b>

105.     On February 16, 2007, Ms. Lawson and her attorney had a meeting with Ellen Moynihan from the SEC Boston office, regarding Ms. Lawson's claims against the Defendants.

106.     On November 23, 2007, Carole Horowitz, OSHA, forwarded Ms. Lawson's fourth claim to Linda Chatman Thomsen at the Securities and Exchange Commission, Division of Enforcement.

107.     On April 29, 2008, Fidelity Investments filed a motion, "<u>DEFENDANTS OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO TAKE ADDITIONAL FACT DISCOVERY</u>," in a related case in which the Plaintiff was deposed, stating: "Ms. Lawson's criticism never gave rise to any investigation of the Defendants by the SEC, the NASD, or any state securities commission, and in fact, none of those regulators ever conducted an investigation into the issues addressed by her." "In March 2008, six months after the conclusion of fact discovery and only after Ms. Lawson's whistleblower complaint was reported in the Boston

Globe, the SEC requested that Fidelity meet with the Staff to explain Ms. Lawson's allegations in that suit. There has been no indication that the Staff intends to pursue the matter."

108.   In 2007, the Plaintiff's securities attorney, John Dougherty, wrote to then chairman of the SEC, Christopher Cox, seeking assistance. Chairman Cox did not acknowledge attorney Dougherty's plea for assistance.

109.   In 2013, when the United Stated Supreme Court granted certiorari to hear the Plaintiff's case, Mr. Cox was one of six former SEC chairman, who submitted an amicus brief supporting the Defendants, "**For the foregoing reasons and the reasons in the brief for Respondents, Amici respectfully urge this Court to affirm the judgement of the First Circuit**."

110.   In 2015, during the Summary Judgement phase of the <u>Lawson</u> litigation, the Defendants told this Court that the Plaintiff's claims had been investigated, and that the SEC had closed the case. Excerpts from the Defendants "STATEMENT OF UNDISPUTED FACTS" is attached hereto as Exhibit 118-121.

111.   The SEC neither communicated with the Plaintiff, nor her attorneys, regarding any planned, or conducted investigation, into any of Ms. Lawson's claims as they did with the Defendants, a showing of the SEC's unnatural affinity with the Defendants in light of their regulatory duties.

112.   The SEC's negligence in properly investigating the Plaintiff's claims is supported by senator Grassley's opinion: "**The SEC does not have a distinguished record of utilizing information from whistleblowers to correct wrongdoing in the public markets**" and: "**The SEC has a long and troubling history of coziness with the industry it regulates.**" A copy of

senator Grassley's May 10, 2011, report to The Honorable Mary L. Shapiro is attached hereto as Exhibit 122-132.

113.    On September 18, 2018, Ms. Lawson, pursuant to 5 U.S.C. § 552, made a FOIA request to the SEC for all information regarding to any investigation of Ms. Lawson's claims.

114.    On September 20, 2018, Tina Churchman, from SEC office in Washington, DC, contacted Ms. Lawson requesting "Verification of Identity."

115.    On September 26, 2018, Ms. Lawson complied with the SEC identity verification request with a photo identification at the SEC's Boston regional office.

116.    On September 27, 2018, Ms. Churchman communicated to Ms. Lawson "**No further information is required. I will proceed.**"

117.    On January 31, 2018, Ms. Churchman contacted Ms. Lawson, apologizing for the delay in providing Ms. Lawson with the FOIA information Ms. Lawson requested on September 18, 2018.

118.    On February, 6, 2019, Ms. Churchman again promised Ms. Lawson, "**We will proceed.**"

119.    However, the SEC did not proceed as promised, and instead waited until two days after the First Circuit Court of Appeals affirmed the district court's 2017 judgement against Ms. Lawson to addressed Ms. Lawson's FOIA request. Primarily, the SEC responded: "**--- we are withholding 159 pages in full pursuant to 5 U.S.C. § 552(b) (4) and (5)**." The timing of the SEC's nonresponse to the FOIA requests evidences that the SEC is an association-in-fact with the FIFE.

120.     On belief the withheld documents contain information that confirms certain

aspects of the operation of the FIFE and these documents can be ascertained during the discovery

phase of this current Complaint.

121.     The SEC does not impose sanctions fairly to all companies, and practices

favoritism. The SEC posed sanctions against Kornitzer Capital Management, Inc. in April 2015,

for violations of Section 15(c) of the Investment Company Act, similar to violations committed

by the Defendants. A copy of the SEC <u>Kornitzer</u> ruling is attached hereto as Exhibit 133-140.

122.     Former FMR Co. employee, John Farinacci, a named conspirator in this RICO

Complaint, currently works for the Securities Exchange and Commission in the Washington

D.C. office. Ascertainment can be made during the discovery phase of this Complaint whether

Mr. Farinacci employment with the SEC played any role in the interference of Ms. Lawson's

FOIA request.

The Plaintiff's FOIA communications with the SEC is attached hereto as Exhibit 141-

153.

## THE METHODOLOGY AT THE HEART OF THE MATTER OF THE MASS-MARKETING FRAUD - "GUIDANCE" A.K.A. "GUIDANCE INTERACTIONS" – GIVING INVESTMENT ADVICE TO THE PUBLIC

123.     The Defendants began offering investment advice to the public circa 2003, through

investment representatives located in the Fidelity Investments branch offices, and various call

centers in the United States. Functionality was later developed granting internet users access to

investment advice via Fidelity's web site.

124.     Fidelity Investments uses the nomenclatures "Guidance" and "Guidance

Interactions," (herein referred as "Guidance") for investment advice.

125.     The investment reps in the branches, and in the call centers, utilize surveys;

Portfolio Reviews; Retirement Quick Checks; Retirement Income Plans; to administer Guidance,

with each interaction averaging thirty minutes. Guidance Cost Pool Development describing Guidance in the Investor Centers and the Phones is attached hereto as Exhibit 154.

126.     The operating costs related to "Guidance" are recorded in the financial models supporting the Fund Profitability 15(c) Process, based on algorithms that factors in the actual time the branch and phone reps spend giving investment advice to prospective customers, and existing Fidelity shareholders.

127.     Historically, Guidance was considered 100% percent Sales/Distribution.

128.     The determination whether expenses should be categorized as <u>Sales/Distribution</u> v. <u>Processing/Servicing</u>, rightfully, and as untruthfully asserted by the Defendants to this Court, should be based on the logic of cost accounting discipline where functional operating activities determines which of the two buckets, expenses should be allocated in Fund Profitability analysis.

129.     In the fall of 2004, after many months of extensive vetting and analysis, which included a detail study of the Guidance activities performed and recorded by the phone reps, Guidance was determined by the external auditor, PricewaterhouseCoopers (PwC), to be 100% Sales/Distribution, which was corroborated by the Defendants' senior operations managers.

130.     PwC's determination that "Guidance" was 100% Sales/Distribution, dictated that all the operating expenses for giving investment advice **must** be allocated in the 15(c) Process as an expense to be borne ***totally*** by Fidelity Investments.

131.     In January 2006, the Guidance methodology was fraudulently changed by the retail organization's CFO; Jean Raymond, to allocate almost half the operating cost of giving invest advice to Fidelity's shareholders as an expense for servicing of their accounts.

132.     To hide the importance of the 2004 event, which highlights the stark difference between the 2004, and 2006, event changing of this major methodology; the Defendants' first

production of the plentiful analyses, emails, Board presentations relating to the approved displaced 2004 methodology were totally redacted; entire pages darkened.

133.     As of January 2006, with the changing of the methodology, Fidelity's shareholders began subsidizing almost half the operating cost of giving investment advice, and as of that time, the offered investment advice became ***not*** "free" as widely advertised by Fidelity Investments.

134.     On May 30, 2007, the Plaintiff presented "Treatment of "Guidance Interaction" Expense in FPI Fund Profitability Analysis, to her immediate supervisors, Betsy Connolly and Claire Cadogan, highlighting the major issues with the methodology. On page 12, the Plaintiff also posed the following questions:

- **"Is Fidelity'[s] treatment of 'Guidance" expense unethical business practice?**
- **Are mutual fund shareholders aware that Fidelity is charging the funds for guidance expense based upon their follow up actions?**
- **By including a portion of guidance expense on the TA P&L, is Fidelity misleading the public on Guidance?**
- **Fidelity is advertising free guidance but reports a portion of guidance expense as processing expense on the TA P&L.**
- **The reps in the branches are receiving sales bonus compensation for guidance [flows] which conflicts with categorizing some of the expense as "TA Servicing**."

135.     In a further attempt to cover-up the Plaintiff's concerns about the deceptive practice, the Defendants did not produce this document during the discovery phase of the <u>Lawson</u> litigation.

136.     Immediately after the May 30 meeting, Ms. Connolly emailed Wendy Zazik in the general counsel's office, then multiple times after Ms. Connolly requested that the Plaintiff remove her name from her presentation, and label the document "Fidelity Highly Confidential." A copy of Ms. Lawson's May 30, 2007, presentation is attached hereto as Exhibit 155-179.

137.    On May 30, 2007, Ms. Connelly sent the Plaintiff's "Guidance Cost Allocation" presentation with Ms. Lawson's claims about the Defendants' deceitful advertising of "free" investment advice to Ms. Zazik, who promptly forwarded the document to her supervisor, Susan McSwain, and external counsel Eugene Scalia.

138.    On July 16, 2007, Ms. Cadogan referenced a meeting with treasury promised by Ms. Connolly to the Plaintiff after her May 30, 2007, presentation: "**Jackie felt strongly that the TA contract does not cover in her view this type of expense and that she was waiting for Betsy to set up time with the Guidance working team to meet with treasury and get them to weigh in on this**." The treasury meeting was never scheduled by Ms. Connolly. A copy on Ms. Cadogan's memo is attached hereto as Exhibit 180.

139.    The Fidelity Mutual Fund Treasury office played an important role in Ms. Lawson's claims in relation to the services covered under the Transfer Agent contract. However, the Defendants did not produce any evidence of any internal investigation with the Treasury Office, even though a request was specifically made by the Plaintiff.

140.    According to the Defendants' Employee Fraud Subcommittee Meeting Agenda, which included Susan McSwain, Fraud is defined as:

"**Fraud** means (i) the use of deception with the intention of obtaining an advantage, avoiding an obligation or causing loss to another party; or (ii) the intentional use of deceit, a trick or some dishonest means to deprive another of his/her/its money, property or a legal right." A copy of the meeting agenda is attached hereto as Exhibit 181-182.

141.    The Defendants' definition of fraud is applicable to the allegation of the Defendants' Mass-Marketing Fraud scheme.

### THE RELATIONSHIP BETWEEN THE MASS-MARKETING FRAUD, THE MASS MEDIA CAMPAIGN, AND THE "GUIDANCE" METHODOLOGY

142.     The Defendants utilizes an aggressive "bait" media campaign as the vehicle in the Mass-Marketing Fraud to lure the public to do business with Fidelity Investments under the guise of "free" investment advice, whose operating costs . . . with the change of the Guidance methodology in January 2006 . . . is subsidized by Fidelity's shareholders.

143.     At trial on November 7, 2017, the Defendants' expert witness, Russell F. Peppet, testified regarding Ms. Lawson's claims about harm to shareholders: "-- **It could then be charged to the customer, whereas Fidelity had proclaimed in some year, 2005, I think, that the guidance interaction activity was free.**" Excerpts from Mr. Peppet's testimony is attached hereto as Exhibit 183-188.

144.     Contrary to Mr. Peppet's statement, the Defendants continued to advertise "free" investment advice, and ramped up their media campaign after the methodology was changed in 2006, aggressively promoting "free" investment advice, while simultaneously burdening the Fidelity Funds' shareholders through the 15(c) Process with almost fifty percent of the operating cost for providing the "free" investment advice to the public.

145.     Effectively, the changed "Guidance" methodology: (1) Negates Fidelity's claim that the "Guidance" offering is "Free;" (2) Qualifies the advertising as deceptive and misleading; (3) Makes the claim of "free" investment advice a misrepresentation.

### THE DEFENDANTS' OVERALL SCHEME

146.     The Defendant's number one objective for offering investment guidance to the public . . . by their own admission . . . is to "Own" the retirement business in the United States of America, using "The Power of Guidance."  Excerpts of Bob Reynolds March 15, 2007,

Presentation to the Board of Trustees, and the April 19, 2007, Board meeting minutes are attached hereto as Exhibit 189-194.

147.    As the Defendants internal communication "Guidance the Fidelity Way" confirmed:

> "**Offering guidance builds relationships because it builds trust. The people you trust the most in your lives include those who provide you with the best guidance. By deepening customer relationships, it will lead Fidelity to become the most trusted provider of lifetime solutions – one customer at a time**."

148.    Fidelity in support of Guidance offerings' expansion, opened new call centers in the United States, increasing the phone representative's headcount in the call centers, generating the largest expense pool for giving investment advice. PwC's Presentation to the Securities and Exchange Commission noted: "**Accordingly, it increased the number of its personnel qualified to engage in those Guidance activities." "For example, headcount at branches increased over 100% from 2004 to 2006**." PwC's "Presentation" is attached hereto as Exhibit 195-212.

149.    The deceptive offering of "free" advice to the public, as planned, successfully attracted customers to use Fidelity Investments' Brokerage Platform. See Exhibit 195-212.

150.    With the opening of the new call centers and the increase in headcount, the operating cost of giving investment advice grew exponentially.

151.    Fidelity Investment changed the Guidance methodology, deliberately to pass to their shareholders a significant amount of the enormous operating costs it was incurring to get into the Guidance business, disingenuously as service fee, which said another way, is akin to building incredible wealth for the Johnson family on the backs of the Fidelity Investments' shareholders.

152.     The principal function of investment adviser companies such as the Defendants, is the management of the investment portfolios. The servicing of shareholder accounts is an incidental occurrence that the Defendants predatorily capitalizes on.

153.     Fidelity Investments, unlike some of their competitors, do not operate on an "at cost" basis, which would benefit the shareholders, and, would be the most ethical policy for the Defendants to adopt if Fidelity Investments was truly performing their owed fiduciary duty to their shareholders.

154.     Fidelity Investments instead of fulfilling their owed fiduciary duties to their shareholder goes to great lengths to manipulate profit and loss margins to benefit themselves at the expense of their shareholders, including, but not limited to, operating the Mass-Marketing Fraud, creating a monopoly in the 401K business, and, reap "pure profits" in excess of $2 billion dollars annually.

## ECONOMIES OF SCALE

155.     Economies of Scale once reached, generates "pure profits."

156.     On belief, by law Fidelity Investments is required to share profits generated from Economies of Scale with their shareholders.

157.     The Securities Exchange and Commission, Division of Investment Management: Report on mutual Fund Fees and Expenses, section I.B.2.b. – Summary of Recommendation – Fund Governance: "**Fund directors should for example attempt to ensure that an appropriate portion of the cost savings from any available economies of scale is passed along to fund shareholders**."

158.     Fidelity Investments as the largest mutual firm in the United States have long ago achieved tremendous economies of scale. Prior to supervising the retail organization's Fund

Profitability 15(c) Process, Ms. Lawson supported the Fidelity Technology Group that maintains the Fidelity Brokerage Platform. Ms. Lawson visited various operations cites in the United States, performing analysis whose results evidenced the Defendants achievement of economies of scale. See Lawson's resume attached hereto as Exhibit 213-215.

159.    On September 21, 2006, retail's CFO, Dick Lyons, and Gerry McGraw, then president for the Fidelity Operations & Services Group (OSG), presented an "FPI Transfer Agency Productivity and Efficiency Measures" to the Board of trustees confirming and attesting Fidelity's achievement of economies of scale, and included in the Summary: "The lower growth rate of TA expenses relative to key cost drivers is a direct result of efficiency and productivity efforts." The September 21, presentation is attached hereto as Exhibit 216-234.

160.    In 2007, the "PwC Commentary to FMR" states under "Summary of Results": "FBC's Pre-Tax FP Margin increased --- due to revenue growth outpacing expense growth," indicative of the benefit achieved from economies of scale.

161.    Fidelity Investments' is able to actualize the lucrative $2 billion dollars annually in "pure profits" because the Defendants do not reasonably share the benefits of economies of scale with their shareholders as recommended by the regulators.

## THE CFOs' PARTICIPATION IN THE SCHEME TO DEFRAUD SHAREHOLDERS

162.    The CFO's primary mandate is to protect the Defendants' lucrative $2 billion dollars bottom line; keep Fidelity Investments' profits growing year over year.

163.    The Mass-Marketing Fraud's ad campaign of 'free" investment advice accomplished its goal very successfully, substantially increasing assets and accounts, thus increasing the Transfer Agent servicing revenue which is based on the number of assets and

accounts under management. Simultaneously, expenses for servicing accounts decreased due to economies of scale.

164.    Increasing revenue growth, coupled with decreasing expense growth, resulted in high profitability margins on the Transfer Agent servicing profit and loss statements.

165.    The CFOs machinated strategies designed to reverse the revenue and expense patterns on the reported profit and loss statements - Hide the lucrative expected revenue, then devise ways to increase expenses; complimentary acts performed to artificially understate the profitability margins.

166.    The CFOs three primary strategies to manipulate the profitability results are evidenced herein:

**(1)    Hide Expected Revenue from the Mass Market Fraud**

167.    On September 29, 2006, CFOs, Harris Komishane and Kate Steed, colluded to hide the plentiful Transfer Agent Fees revenue that the retail business expects to reap from The Mass-Marketing Fraud, in a bucket called "Other Revenue." Ms. Lawson's team would not recognize this hidden TA revenue in "Other Revenue," and therefore would not include this revenue on the Transfer Agent profit and loss statement. At trial on November 1, 2017, Mr. Komishane confirmed: "--- **But anything put in "other revenue" would <u>not</u> make it into the TA P&L**."

168.    Analyst Cristen Coleman, who reported to Ms. Steed, acknowledged: "**The TA P&L also receives a lot of exposure by the Board, and the increased TA revenue could lead the Board to suggest a fee reduction.**"

169.    Mr. Komishane confirmed Ms. Coleman's assessment of the Board's reaction to high expected TA revenue: "**This will impact our TA P&L which will no doubt be under the**

**microscope this year**." Mr. Komishane's communication with retail finance is attached hereto as Exhibit 235-236.

170.    The exclusion of the hidden TA revenue in "Other Revenue" did indeed artificially lower the TA margins, when the profit and loss statements were completed on October 13, 2006. The lucrative forecasted TA service revenue hidden in "Other Revenue" was actualized in 2007.

**(2)    Conniving Ways to Increase the Expenses on the Transfer Agent Profit and Loss Statement**

171.    The fraudulently changed Guidance methodology increased the expenses on the Transfer Agent profit and loss statement.

172.    On October 13, 2006, Ms. Lawson saw for the first time the impact of the hidden revenue coupled with the changed Guidance methodology, that added significantly more expenses to the Transfer Agent Profit and Loss statement. The Transfer Agent P&L 2006 margin significantly and abnormally decreased from the 2005 margin, prompting Ms. Lawson to advise her immediate supervisors, Mr. Komishane and Ms. Cadogan, that the significantly lower margins were suspect.

173.    Ms. Lawson refused to forward the analysis to FMRCo. The decrease margin is discussed under "Major impact on Transfer Agent margins" in Excessive Transfer Agent Fees – "Guidance Interactions." See Exhibit 41-50.

174.    On October 23, 2006, Ms. Cadogan acknowledge Ms. Lawson's October 13, concerns about low TA margins: "**You mentioned you felt the margin was very low as was estimated for 2006 and thought it was driven by the new phones methodology.**" Ms. Cadogan's email communication is attached hereto as Exhibit 237.

**(3)**      **Planned Continuation to Increase Expenses to the Shareholders**

175.     In 2006 and 2007, CFOs Jean Raymond and Harris Komishane, spearheaded an initiative, "Brokerage In FP," planning to further allocate even more costs to the Fidelity Funds by allocating previously excluded "Individual Securities" to the Fidelity Funds . . . again with the specific intent to lower the profit margins.

176.     On May 12, 2006, Mike Freeman reported "Brok in FP Preliminary Results" showing a "P&L impact.xls" stating "---**the impact of all the above is to reduce PI's total 2005 FP income/margin from a reported $454.5M/28.4% to $336.4M/18.5% in the proposed "50%" scenario. The reduction in net income is $118.1M!**" Emails related to this initiative are attached hereto as Exhibit 238-239.

### THE DEFENDANTS' 401K BUSINESS

177.     Devising ways to show the Board low profitability numbers are a normal way for the Defendants to conduct business.

178.     Profitability at first, is usually low on most startup businesses. Commonsensically, that is the case because a company has infrastructure, sales, and marketing costs before it starts earning any money on the product. When the Defendants first started their 401K business, they allocated a significant portion of the start-up cost of selling 401K plans to the Fidelity Funds, using a justification that when their sales group visit companies to sell 401K plans, they also have a conversation at the same time about the Fidelity Funds. At first glance there does not seem to be any wrongdoing with this practice. However, in reality that practice served the Defendants best interests by dramatically lowering profitability. For one of those years' retail's profitability was 15%, but the consolidated number after including the 401K business was 8%.

179.    CFO Jean Raymond, responsible for changing the Guidance methodology for the retail organization, was also the head of the 401K finance group supervising Fund Profitability analysis at the time the controversial 401K methodology was implemented. Around the time that the Guidance methodology was changed, Ms. Raymond was promoted and reported directly to Abigail Johnson.

## THE CFOs' UNNATURAL FOCUS ON TRANSFER AGENT MARGINS

180.    The evidential linchpin of the importance of showing low profitability margins is the CFOs unnatural focus on manipulative tactics to lower the profitability margins, whose end user, and sole user, is the Fidelity Board of Trustees.

181.    Fund Profitability analysis as a regulatory requirement; part of The Securities and Exchange Act, 15(c) Process, mandates that the Board of Trustees for mutual fund companies such as the Defendants, review the profitability of investment advisers as a factor in deciding the contracts between the investment advisers and the mutual funds that they manage.

182.    The CFOs do not use Fund Profitability analysis for business operations. The CFOs utilizes a separate set of analysis called Client and Product Profitability (CPP), to manage the business operations. At Fidelity Investments the only end user for Fund Profitability analysis, is the Fidelity Mutual fund Board of Trustees to conduct the business of the annual contract renewals between The Fidelity Funds and Fidelity Investments.

Two examples of the CFOs keen interest in the TA P&Ls:

183.    On April 4, 2006, Mr. Freeman distributed an email to the retail organization finance staff about an additional $9M for "Phones Guidance Activities": "**The $9M is not material by fund, <u>but has an impact on our total TA P&L</u>, so Jean was pleased with this result.**"

184.    On February 2007, Ms. Cadogan behind Ms. Lawson's back questioned her staff:
"**Dick is aware that we changed the Guidance methodology to allocate out to IS and reduce FP/TA P&Ls but he is not seeing that clearly so there is some activity offsetting his decrease that we need to explain**." Copies of the emails are attached hereto to as Exhibit 240-241.

### THE CORRELATION BETWEEN HIGH PROFITABILITY MARGINS AND THE ANNUAL CONTRACT RENEWAL PROCESS

185.    The expenses allocated in Fund Profitability paves the way for how much fees Fidelity is contractual authorized to collect from the Fidelity Funds, since pursuant to the 15(c) Process, the Board of Trustees must review Fidelity's profitability as one of the major factors in consideration to renew Fidelity's annual contract with the Fidelity Funds.

186.    There is an inverse correlation between profitability and the contracts fee structure. High profitability margins relative to industry standards may result in The Board renewing the annual contracts between Fidelity Investments and the Fidelity Funds at lower rates, thus adversely impacting the Defendants' bottom line.

187.    In November 2017, Michael Freeman, who reported to JS Wynant in FMR Co.'s Board Support Group for four years, confirmed the relationship between profitability margins and The Board's behavior:

> Q. Mr., Freeman, was it your understanding that the lower the profitability that Fidelity showed the Board the less likely the Board was to lower the contract fees.
>
> **A. Yes.**
>
> Q. And conversely, the higher the profitability that Fidelity showed the Board made it more likely the Board might lower contract fees?
>
> **A. That's right, that's correct.**
>
> Excerpt of Mr. Freeman's testimony is attached hereto as Exhibit 242-247.

**THE BUSINESS CFO'S CONTROLL OF FUND PROFITABILITY ANALYSIS IS AN
ESSENTIAL COMPONENT TO THE SUCCESSFUL OPERATION OF
THE MASS-MARKETING FRAUD**

188.    In August 2004, a new "Shared Services" organization was formed, which

included the Board Support Group (BSG), supervised by Ms. Lawson, 2004 - 2007.

The Plaintiff's expert witness Mercer Bullard opined on the new 2004 structure in his

2015 Expert Report:

> "Fund managers also seek to prevent such abuses in calculating profitability in
> part by assigning personnel who are specifically trained in the nuances of fund
> profitability calculations and other *Gartenberg* factors. The personnel who are
> responsible for financial analysis and reporting in a fund manager's business
> divisions generally do not have the expertise to produce accurate or complete
> 15(c) Process materials. The business divisions also may have an incentive to
> manipulate the data as described *supra*. Large fund complexities such as the
> Defendants have the luxury, due to economies of scale, of being able to develop
> highly specialized expertise among personnel who can be tasked primarily, or
> even exclusively, with ensuring that the 15 (c) Process materials provided to the
> fund complex's directors are accurate and complete. The Board Support Group
> that was led by Ms. Lawson reflects this approach. This structure provides the
> independence and expertise necessary to ensure that legal mandates are followed
> and the liability risk to the adviser and directors is minimized."

189.    Ms. Lawson on dictate from senior managers, and in compliance with the

methodology approval process required by the 15(c) Process, began in-depth review of the retail

organization methodologies, and met resistance from CFO, Jean Raymond. Subsequently, the

Plaintiff was removed from her day to day supervision of the BSG to work on a special "Transfer

Agent Billing Framework Project" which entailed traveling to locations in Texas, and Kentucky.

The Defendants' admitted that Ms. Raymond asked for Ms. Lawson removal from the BSG.

190.    During Ms. Lawson's absence from the group, Mr. Freeman, her immediate

supervisor, in violation of the 15(c) Process, implemented the unvetted, unapproved Guidance

methodology, originally for the retail branches, on instructions from Jean Raymond.

191.    In March 2006, Ms. Lawson resumed supervision of the BSG group, and in June

2006, the BSG commenced the usual annual review of methodologies as stated by the

Defendants to regulators.

> **"Methodologies are subject to formal review annually by the business units,**
> **as well as by FMR and PricewaterhouseCoopers LLP. Significant changes**
> **are typically presented to the Board of Trustees annually in November."**

192.    Reviewing methodologies for reasonableness and appropriateness, and routinely

answering questions from FMR Co., PwC, and other groups are part of the BSG's

responsibilities.  Supporting emails are attached hereto as Exhibit 248-254.

193.    On May 08, 2006, John Farinacci, Head of Board Support for FMR Co.,

particularly questioned the Guidance methodology: "**John would like to understand the**

**process you use to allocate costs associated with guidance interactions.**" The Plaintiff

assigned BSG senior analyst Joe Guinta to provide FMR Co. with an answer. Email attached

hereto as Exhibit 255.

194.    In June 2006, the Plaintiff was unaware of the Guidance methodology change

implemented in her absence from the group, but similar to Mr. Farinacci, she was aware of its

impact; significant swing in expenses from the Distribution bucket to the Service bucket that

would need to be explained to FMR Co. and PwC, in the regular course of performing her duties.

195.    On August 10, 2006, Ms. Lawson met disturbing resistance from the retail

organization finance personnel; senior director Claire Cadogan, and vice president Tim Rooney,

when she questioned the accuracy of the financial model "call content" used to tabulate and

allocate Guidance expenses for the retail _phones_ organization, which was moving over $50

million from Distribution to Service for the phones organization.

196.     Ms. Cadogan acknowledge Ms. Lawson's reaction to the methodology in the August 10, 2006, review meeting between the BSG and the retail finance group: "**Jackie voiced her strong objection to the methodology ---**."

197.     After the August 10, 2006 meeting, where Ms. Lawson challenged, and "voiced her strong objection" to the new Guidance methodology, Mr. Freeman began unduly pressuring and urging Ms. Lawson on multiple occasions to rubber-stamp the methodology. Ms. Lawson adamantly refused to bypass the normal 15(c) Process that required thorough vetting of all proposed new methodologies. Mere weeks later in September, Mr. Freeman was promoted to a vice president position in another Fidelity company, and Ms. Cadogan was made Director of the BSG.

198.     The Defendants demoted the Plaintiff because she would not join the party line and rubber-stamped the Guidance methodology for the retail phones organization as Mr. Freeman did for the retail branches organization. The Defendants then later untruthfully publicized to various courts and the media, that Ms. Lawson started objecting to the Guidance methodology only after she had been passed over for a promotion.

199.     On November 1, 2017, Mr. Komishane's testimony confirmed Ms. Lawson's integrity: **Q. "You never had a sense, did you, to question the integrity level at which Jackie Lawson operated when she was in the Board Support Group, her integrity? A. "No."**

200.     Mr. McManus, the BSG analyst Ms. Lawson assigned to vet the new Phones methodology, unearthed the issues with the Guidance methodology, and brought his concerns first to Mr. Freeman, and then escalated it to Ms. Lawson. The retail organization as required, refused to produce any rationale, and supporting analysis for their Guidance submission to the BSG. Mr. McManus could not reconcile the underlying data supporting the methodology, which

caused review meetings to be rescheduled more than three times over a period of two months.

Mr. McManus's concerns, and the concerns of others, with the methodology is attached hereto as

Exhibit 256-263.

201.    The Defendants' disingenuity about a promotion is meant to obscure the real issue;

the BSG's independent governance, which was compromised with Ms. Cadogan's installation in

the group. Compensation, as implied by a promotion, was not the concern of the Plaintiff, since

Ms. Lawson's compensation package was significantly higher than Ms. Cadogan's.

202.    More importantly, the retail organization gained the "**Positional Authority**"

essential to authorizing methodology changes in the Fund Profitability system controlled by the

BSG. With Ms. Lawson's effective status demotion, Ms. Cadogan acting in her role as a retail

loyalist, overruled Ms. Lawson's "strong objection" and in her first week, violated the 15(c)

Process and implemented the unvetted and unauthorized Guidance methodology for the phones

organization.

203.    The Plaintiff, until her constructive termination on September 21, 2007, tried to get

the Defendants to correct the illegal, illogical Guidance methodology, instituted by the CFOs to

cheat the contract renewal process, causing harm to shareholders, including, but not limited to:

    i.       In December 2006, Ms. Lawson escalated the issue to PwC.

    ii.      In January 2007, Ms. Lawson and her staffed conducted interviews with the reps who performed Guidance to determine whether the activity had changed since the methodology had been vetted in 2004.

    iii.    In January 2007, Ms. Lawson consulted with the Fidelity Treasury Group to interpret the Transfer Agent Contract.

    iv.    On January 22, 2007, after Ms. Lawson escalated the issue to FMR Co Board Support Group, who called an emergency meeting, which included the mutual funds attorneys, and where Ms. Lawson presented the findings of her investigation.

    v.     On May 30, 2007, Ms. Lawson escalated the issue to new supervisor Ms. Connolly.

vi.      Ms. Lawson further escalated the issue to the general counsel in May 2007.

vii.     In 2007, Ms. Lawson requested permission to speak with the Board of Trustees on the issue, which was denied by the general counsel.

204.    On January 5, 2007, Ms. Lawson and staff members, analysts Mark McManus and Joe Guinta, on PwC's recommendation, conducted an interview with reps at the investor center located at Congress Street, Boston. Ms. Lawson informed Ms. Cadogan that the rep's activities had not changed since 2004 when the previous methodology was instituted; and thus, did not support a methodology change from 100% Sales/Distribution. An email referencing this meeting is attached hereto as Exhibit 264.

205.    Ms. Cadogan responded by producing a Transfer Agent contract, with a highlighted section that Ms. Cadogan said covered "Guidance" activities. Earlier, on December 18, 2006, Ms. Cadogan, sent an email to her former peers, two retail vice presidents:

> "Hi John and Jack. Attached is the TA agreement that outlines services to be provided by the Transfer Agent. I believe the section where Guidance interactions --- would fall under section 3c(3) of services to be performed under the contract." Ms. Cadogan's email communication and the Transfer Agent contract is attached hereto as Exhibit 265.

206.    Ms. Cadogan, in her deposition in 2015, admitted that she unilaterally interpreted the contract, then notified her former peers in the retail organization about her findings regarding the contract as an after the fact justification.

207.    On January 9, 2007, Ms. Cadogan wrote: "**The team reviewed the TA contract and services covered under the contract and agreed that Guidance interactions --- are covered under the contract**." A copy of Ms. Cadogan's email is attached hereto as Exhibit 266-267.

208.    Neither Ms. Cadogan nor the "team" is qualified or authorized to interpret the Transfer Agent Contract, and did not consult with the Fund Treasury Office to interpret whether

Guidance is covered under the contract. The designated authority to interpret the services covered by the Transfer Agent contract is the Fidelity Mutual Fund Treasury group, and Patty Thibodeau, an attorney in that group, disagreed with Ms. Cadogan's and the "team's" interpretation of the servicing contract.

209.    On February 05, 2007, Ms. Cadogan told Mr. Komishane, after Ms. Lawson escalated the issue to FMR Co. on January 22, "**I understand that there is now going to be a good amount of focus on FBC's current TA billing structure stemming somewhat to the FRIAG/FESCO issue but also due to Jackie's various discussion (with legal and treasury's office) as well as her announcement**." A copy this email is attached hereto as Exhibit 268-273.

210.    The Plaintiff's expert witness, Mercer E. Bullard, after reviewing the contract, concurred with Ms. Thibodeau that giving invest advice is not covered under the contract.

211.    Mercer E. Bullard, an MDLA Distinguished lecturer and Professor of Law, has impressive credentials qualifying him as a reliable and credible authority on the relevant subject matter. Professor Bullard is a former Assistant Chief Counsel in the Division of Investment Management in the Securities and Exchange Commission. On page 46 of his expert report, Professor Bullard wrote: "**I have reviewed the contract and agree that the contract did not cover Guidance Interaction services**." A copy of the Transfer Agent Agreement is attached hereto as Exhibit 274-278.

212.    Ms. Thibodeau's assessment was confirmed on June 3, 2008; PWI Guidance Methodology Meeting," under "Review of Transfer Agent Expense: **"[Claire] noted that the Treasurer's Office stance is to take the language in the contract very literally.**" The meeting notes and excerpts from Ms. Cadogan's deposition on the topic are attached hereto as Exhibit 279-281.

213.    The Defendants, after learning of Ms. Thibodeau's involvement, placed her on a six-week leave from the company around the time they were notified that OSHA would commence an investigation into Ms. Lawson's claims.

## GUIDANCE METHODOLOGY NON-DISCLOSURE AND QUESTIONABLE EXISTENCE

214.    The Guidance methodology was not approved by PwC, FMR Co. and The Mutual Fund Board of Trustees before its implementation, as promised in the Annual Fund Reports to shareholders.

215.    Mr. McManus' testimony in November 2017 confirmed the methodology's unusual lack of visibility:

> **"We, Fidelity had a specific guidance methodology. I don't know who wrote it or who created it, but I know that guidance was supposed to be treated in a certain way --- I just don't know who was doing the instructing, who was doing the writing."**

216.    Mr. McManus' testimony highlights the methodology's questionable existence, considering that it is one main responsibilities of the BSG to perform impact analysis of all methodology changes, then present the results to PwC and FMR Co, and ultimately the Board. A typical Fund Profitability Responsibilities document is attached hereto as Exhibit 282-289.

217.    In December 2006, PwC stated to the Plaintiff that they were not aware of the new methodology. This is confirmed by Ms. Cadogan's on October 30, 2006: "**When I met with Dave and Nigel last week, they mentioned that they were not aware of any major methodology updates that they need to review**." A copy of this email is attached hereto as Exhibit 290.

218.    The Defendants are not able to produce any evidence that FMR Co. Board Support Group, PwC, or The Board was notified of the methodology prior to its implementation.

## "GUIDANCE" METHODOLOGY MISCOMMUNICATION TO THE BOARD

219.    After the Plaintiff began challenging the methodology, the Defendants reported the methodology as a refinement in the Appendix section of a November 14, 2006, Board memo, and not as a change.  Up until the communication to the Board, the methodology was presented as a major change by the retail organization in all the related communications to the BSG, FMR Co., and PwC.

220.    In April 2007, "PwC Commentary to FMR" reporting on 2006 Summary of Results, stated: "The **major methodology changes** had a **significant impact** on results for PI," "**Phones Guidance** – FY05-100% Distribution, FY06 53% DIST / 47% Proc." A copy is attached hereto as Exhibit 291-297.

221.    The Defendants' 2006 Mutual Fund Profitability Business Overview, prepared by FMR Co. also stated: "**In 2006, a change was made in the Phones Channel methodology to treat Guidance expense consistent with the treatment of Investor Center Guidance expenses**."

222.    In Fund Profitability analysis, refinements typically are representative of updates in the underlying statistical data of existing methodologies, and although reported, does not warrant much attention from the Board, especially when placed in the Appendix section of a Board memo, as a none event.

223.    The actual communication to the Board was: "**PI Phone Guidance – Allocate a portion of Guidance expense to servicing, consistent with methodology for branches and Web;**" a deceptive communication on many levels, as is the reported dollar impact.

224.    The normal process is to inform the Board in November of the proposed methodology change, and after approval is given, implement the following year in January; the Guidance methodology bypassed this process.

225.    The Board was not told:

i.      That the <u>Branches</u> had already implemented the Guidance methodology in January 2006, and that the methodology had not been approved by the Board the prior November, and that it was already used in analysis.

ii.     That the <u>Phones</u> group had already implemented the Guidance methodology in September 2006, and it was already used for the TA P&Ls provided to support the annual contract renewal.

iii.    That the total impact of the methodology change was a $69.1 million-dollar shift and not the $12 million reported.

iv.     That the 2007 impact of the methodology change was estimated to be well over $100 million on the TA P&L.

226.    FMR Co presented the impact as a minimal "(0.03% reduction in after-tax margin). Five months later, on Mar 19, 2007, Ms. Cadogan produced her own analysis after Ms. Lawson escalated the "Guidance" methodology issue to FMRCo, showing the true percentage impact: "If Guidance related expenses were 100% classified as sales," "**FBC's margin would increase 19% vs 14.7% reported**." Excerpts of the Board memo and Ms. Cadogan's analysis is attached hereto as Exhibit 298-303.

227.    The Defendants during the <u>Lawson</u> trial used the same FMR Co. analysis to show the jury that the Guidance methodology change was so minimal an impact that it could not be considered shareholders' fraud, injuring the Plaintiff's credibility.

### THE ILLEGALITY OF THE "GUIDANCE" METHODOLOGY

228.    Cost accounting is the approved discipline to fairly allocate costs to the Fidelity Funds as the Defendants' promised in the Annual Fund Reports. Accordingly, Fidelity

Investments uses Activity Based Costing, which allocates cost based on the activities performed by the operational groups incurring the costs in the organization.

229.    On June 30, 2008, Fidelity's expert witness; Russel F. Peppet untruthfully continued to attest to Fidelity's use of cost accounting to allocate operating costs in Fund Profitability analysis: "**This exercise falls within the discipline of <u>cost accounting</u>**." Mr. Peppet's Expert Report of June 30, 2008, which was filed with this Court, is attached hereto as Exhibit 304-337.

230.    Under "Findings and Conclusions on page 12 of his Expert Report, Mr. Peppet wrote:

Criteria for Judgement:

"In reviewing a **<u>cost accounting</u> system**, it is desirable to enumerate the criteria upon which it will be judged. Further evaluation of a **<u>cost accounting</u> system** should be made relative to its purpose. Consistent with my experience in past cases and my work with other mutual fund investment advisers, my understanding of the primary objective of the Fund Profitability system at Fidelity is to produce reasonably accurate information concerning the revenue, cost, and profits associated with each of the Fidelity mutual funds sufficient to provide the Board of Trustees a reasonable basis for considering these factors in exercising their business judgment in the review of the management contract with Fidelity."

Objectivity:

"Has the system been designed to achieve its purpose? Have sound **<u>cost accounting</u> principles** been adhered to? Does the system utilize reasonable **<u>cost accounting</u>** methodologies? (e.g. Does the system use "**<u>activity-based costing</u>**" methods whenever possible?) Are the methodologies and techniques employed by supported by good logic? Is the system free of bias and unwarranted manipulation? **Have allocation bases been chosen to reasonably reflect the nature of the expenditure and its consumption within the organization**? Is there an effort to use an objective, rather than subjective, allocation basis.?"

Other excerpt from Expert Report:

"Are material changes approved by independent, third-party experts to ensure adherence to sound **<u>cost accounting</u> theory**?"

231.    On March 30, 2006, David Trerice; PwC partner, sent a report to Marie Knowles,

Board of Trustees member, and Chair of the Audit Committee for the Fidelity Funds, titled"

"Fund Profitability Assessment Framework."

232.    Mr. Trerice in the attached email to Ms. Knowles stated that he met with "JS,

John Farinacci and their team," and, in referencing the Framework communicated:

> In addition, we also discussed the framework and criteria used to assess Fidelity's
> methodologies for "reasonableness" as documented in the attached file. This
> framework has been reviewed by the FMR Co. team and Scott Goebel and their
> comments have been reflected herein. The framework will become an appendix in
> our report (similar to Fidelity's Procedure and Methodology document) we shared
> with you several weeks ago."

233.    PwC's "Fund Profitability Assessment Framework" in strong terms confirmed the

incontestable rule of cost accounting discipline that: "**The methodology *must* consider the**

**mutual fund business activities associated with the underlying organizational structure** ---"

Mr. Trerice's email to Ms. Knowles and the Fund Profitability Assessment Framework is

attached hereto as Exhibit 338-345.

234.    The new "Guidance" methodology is diametrically opposite to cost accounting,

and contradicts every major point in Mr. Peppet's Expert Report, and violates the "***must***" in the

"Fund profitability Assessment Framework."

235.    The reps record that they are performing a 100% Distribution activity. The retail

finance group waits 90 days, and then illegally allocate almost half the Distribution/Sales

expense to the Fidelity funds as shareholder Servicing/Processing account expenses.

236.    This anomaly is questioned in a retail finance document, under "Issue" in

September 21, 2006, "**Dick L. is concerned about the increase in expense allocated to**

**processing. How can processing be increasing if the reps are setting sales records**?" The

retail finance organization's <u>Action Items for Fund Profitability Process</u> is attached hereto as Exhibit 346-348.

237.    On December 19, 2006, *after* the Board was notified that some of Guidance operating costs would be allocated to service, PwC still questioned the practice. Retail acknowledged: "**List of questions from PwC on Guidance. The questions range anywhere from should any guidance be in processing? ---**." A copy of this email is attached hereto as Exhibit 349.

238.    A year later, on September 10, 2007, Ms. Cadogan's hand written notes of a meeting between PwC, FMR Co, Betsy Connolly, Claire Cadogan on "Guidance Review" communicated PwC's opinion on the Guidance methodology: "**PwC not a fan of result based, more comfortable with activity-based costing**." PwC in the same meeting, used as point of reference other fund companies; T Rowe Price, Dreyfus, Franklin Templeton, advising that Fidelity's other business allocated zero dollars of this distribution expense to their shareholders. Ms. Cadogan's Hand written note is attached hereto as Exhibit 350-351.

239.    Nine months later, on June 3, 2008, Ms. Cadogan, after describing the "PI Phones Guidance Methodology" reiterated: "**Claire noted that PwC and FMRCo are not comfortable with results-based allocation methodologies.**" See Exhibit 279-281.

240.    On January 8, 2007, Ms. Smaga shared with Ms. Lawson a presentation justifying the new "Guidance" result-based methodology which stated: "**Analysis of guidance interactions leads us to acknowledgment that they are a composite of both distribution/processing (Sales and service**)."

241.    When Ms. Lawson requested the supporting analysis, Ms. Smaga confessed that no analysis had been performed to legitimatize the new methodology, and that the sole reason for

changing the methodology was the arbitrary dictate from Jean Raymond to find a way to burden the shareholders with some of the staggering growing operating costs for giving investment advice to the public.

242.    The question of whether any of guidance could be "considered TA" arose as early as September 2005, around the time Ms. Lawson was removed from her day to day supervision of the group. On September 29, 2005, Mr. Freeman wrote to the BSG financial analysts: "**As planning and Guidance grows in PI, can any of this expense be considered TA, --- We need to look at this in future years**." This proposed vetting exercise was not done prior to the implementation of the change methodology months later in January 2006. A copy of Mr. Freeman's email is attached hereto as Exhibit 352.

243.    The Defendants' later in 2007 when investigating Ms. Lawson's claim admitted that: "**JHL right that no transaction done or rebalancing done in the guidance interaction**" A copy of the Defendants' handwritten investigation notes attached hereto as Exhibit 354-356.

244.    The resulting profits qualifies as a violation of Section 36(b) of the '40 Act --- "**The fee charged must be so disproportionately large that it bears no reasonable relationship to the services rendered and could not have resulted from arm's length bargaining**."

245.    The Defendants in discussing a presentation to the Board on the Defendants' TA fees admitted that: "**They received the "deep dive competitive analysis" which indicated we have one of the more expensive TA rates in both our Direct & Intermediary channels. One of the trustees did comment that we did appear to provide higher service in what seemed to JS as trying to justify the higher rates. Other than that little reaction.**" See Exhibit 357-358.

## THE DEFENDANTS' DECEPTIVE MARKETING PRACTICES

246.     Fidelity receives unwarranted revenue from the Mass-Marketing Fraud, and the

Defendants use some of the proceeds to fund the massive multi-year media campaign promoting

"free" investment advice.

247.     On December 12, 2007, PwC posed the following question: "**Please provide**

**rationale for Phones increase in guidance volume**," to which the Defendants responded: "**The**

**increase in Guidance interactions is the result of: 1) Focused marketing efforts (TV,**

**newspapers, etc.) on retirement (guidance) products. 2) Branch/Phone representatives**

**increasing efforts to make our existing/potential customers aware of our guidance products**."

PwC Interim Questions is attached hereto as Exhibit 359-364.

248.     Fidelity Investments for the purpose of attracting customers to open accounts on its

brokerage trading platform, employed, and continues to employ an aggressive marketing

campaign; spending over $500 million annually, through television, internet, newspapers, and

other advertising media, using the slogan "Free Guidance."

249.     The Defendants' expert witness, Russell Peppet, testified in 2017 that the

Defendants advertised "Free Guidance" only in 2005. However, the Defendants continued

advertising "Free Guidance" after the methodology was changed in 2006.

250.     The allocation of almost half of the operating cost of giving investment advice to

the shareholders as a servicing expense makes the Defendants' claims of "Free Guidance" false

and misleading, and in violation of:

> Rule 206(4)-1(a) – It shall constitute a fraudulent, deceptive, or manipulative act,
> practice, or course of business within the meaning of section 206(4) of the Act (15
> U.S.C. 80b-6(4)) for any investment adviser registered or required to be registered
> under section 203 of the Act(15 U.S.C. 80b-3), directly or indirectly, to publish,
> circulate, or distribute any advertisement:

1)      Which contains any statement to the effect that any report,
        analysis, or other services will be furnished free or without charge,
        unless such report, analysis or other service actually is or will be
        furnished entirely free and without any condition or obligation,
        directly or indirectly; or

2)      Which contains any untrue statement of a material fact, or which is
        otherwise false or misleading.

## CHARGING EXCESSIVE FEES AND CONDUCTING OTHER UNFAIR BUSINESS PRACTICES ARE THE DEFENDANTS' NORMAL WAY OF CONDUCTING BUSINESS

Bennet v. Fidelity Management & research Co. (Civ. No. 1:04-cv-11651)

251.    In a related Class Action suit, Bennet v. Fidelity Management & research Co.

(Civ. No. 1:04-cv-11651), United States District Court for the District of Massachusetts, the

Defendants were accused of charging the Fidelity Funds retail shareholders **excessive**

**management fees**.

252.    The Defendants settled the Bennett case in 2008.

Tussey v. ABB, INC.

253.    Employees of ABB sued ABB and Fidelity Investments in a class-action lawsuit

for **excessive fees** charged by Fidelity Investments.

254.    According to court records "The district court properly found ABB breached its

fiduciary duties by:

- "Allowing Fidelity to receive **excessive recordkeeping compensation** through revenue sharing.  The evidence clearly shows ABB's blatant conflict of interest in allowing Fidelity to receive these fees to benefit itself and altogether failing to monitor Fidelity's compensation.  **This excessive compensation** violated the IPS and ERISA's strict fiduciary duties."

- "Moving all participant investments from the stellar-performing Vanguard Wellington Fund into the untested Fidelity Freedom Funds for no prudent and loyal reason and in violation of the IPS.  Instead, this move was part of ABB's conflict in benefitting Fidelity and itself through corporate services provided by Fidelity to ABB at a loss."

- "Selecting higher-cost share classes of Plan mutual funds **for the purpose of benefitting Fidelity**, violating the IPS and ERISA's duties of loyalty and prudence."

255.  According to one news article: "**In fact, the court found that the amount Fidelity was receiving for recordkeeping was <u>far in excess</u> of a reasonable recordkeeping fee, in some years by as much as <u>100%</u>**."

**<u>Fidelity Investments Employees</u>**

256.  Fidelity Investments' employees sued Fidelity Investments because of improprieties and what they regarded as "unfair business practices" in Fidelity Investments' management of the employees' 401K business.

257.  Fidelity Investments settled the 401K lawsuit with their own employees.

**<u>The Commonwealth of Massachusetts Office of the Secretary of the Commonwealth Securities Division</u>**

258.  On October 26, 2015, The Commonwealth of Massachusetts Office of the Secretary of the Commonwealth Securities Division, filed a claim against Fidelity Brokerage Services LLC for violations of Mass. Gen. Laws ch. 110A. the Massachusetts Uniform Securities Act, and 950 Mass Code Regs. 10.00-14.413 alleging Fidelity's willful ignorance of and complete failure to detect and prevent unregistered activity has left Massachusetts individual investors, including Fidelity's own customers, at risk and constitutes <u>a</u> **<u>clear case of dishonest and unethical behavior</u>**. "The Rice Section alleges Fidelity acted in a dishonest and unethical manner and breached its obligation to observe high standards of commercial honor and just and equitable principles of trade in the conduct of its business."

**401(k) Self-Dealing Lawsuit**

259.    In October 2018, "A new lawsuit has been filed against Fidelity Investments and its parent company, FMR, accusing the firm's 401(k) plan fiduciaries of self-dealing among other things."

260.    "The complaint accuses plan fiduciaries of using the plan as an **opportunity to promote Fidelity's mutual fund business at the expense of the plan and participants**."

261.    "The lawsuit alleges that the defendants knew their conduct was unlawful because they settled a similar lawsuit four years ago." Fidelity Investments is accused of **breaching their fiduciary duties**.

**U.S v. Fidelity Investments**

262.    On February 28, 2019, the Wall Street Journal in an article titled "U.S. Probes Fidelity on Obscure Fee" reported that: "The Labor Department is investigating Fidelity Investments over an obscure and confidential fee it imposes on some mutual funds."

263.    "The Fidelity Infrastructure fee is also the subject of a lawsuit filed last week in a Massachusetts federal court by a participant in a retirement plan by T-Mobile US, Inc. In that suit, the plaintiff contends that the infrastructure charge is prohibited by ERISA and that Fidelity incentivizes mutual funds on its platform to "**conceal the true nature of fees associated with these funds**."

**Circo v. Drew, 80 Mass. App. Ct. 1114-2011**

264.    In a 2009 trial, involving former employee Jim Circo, the Defendants articulated their unsavory normal business practices. The Defendant's in their closing statement to the jury verbalized the Defendants' stance regarding "unfair business practices" and "malice:" "Terminating an employee without providing explanation is not malice.  Hasty decision-making

is not malice.  Poor management or even sloppy business practices is not malice.  Even personal

dislike by a supervisor is not malice.  **Most importantly, even an unfair business practice,**

**even if you find that, that's not malice**."

### NONDISCLOSURES AND INADEQUATE COMMUNCIATION TO THE FIDELITY MUTUAL FUND BOARD OF TRUSTEES ARE A NORMAL WAY OF BUSINESS FOR THE DEFENDANTS

265.    In December 2006, Chairman Edward Johnson went against the recommendation

of Mr. Jonas, Stuart Fross and Eric Roiter, about repaying fund-paid 12b-1 fees illegally retained,

and bringing the issue to the Board.

266.    Important "Open Questions" not presented to the Board:

(i)      Should the funds be reimbursed for the retained 12b-1's and

(ii)     Should NF be allowed to continue retaining 12b-1's.

A copy of the presentation is attached hereto as Exhibit 365-366.

### SILOING AND HIDING INFORMATION ARE NORMAL WAYS OF THE DEFENDANTS OF COVERING-UP CLANDESTINE ISSUES

267.    On May 16, 2007, the Plaintiff routinely requested Board memos for review

purposes.  FMR Co. in an unusual response, denied the Plaintiff's request: "**We generally do not**

**distribute board-level memos**."

268.    Reviewing Board memos for accuracy, as dictated by Ms. Cadogan, is part of Ms.

Lawson's work responsibilities, and historically these memos were readily available for Ms.

Lawson's review. For instance, on November 2004, FMR Co. requested to the Plaintiff: "**Please**

**review and provide any feedback you have on the memo by mid-day tomorrow**."

269.    Shockingly, FMR Co after denying this normal request, in a show of collusion

with Ms. Cadogan forwarded the Plaintiff's request: "**As we discussed**" and "**I let her know we**

**are sensitive to releasing this information to everyone**" and "**We sanitized our presentation**

**to include no profitability numbers or fund names, and presented on screen rather than via handouts**.” These Board related emails are attached hereto as Exhibit 367-370.

270.    On October 17, 2006, Robin Cannon in FMR Co. notifies his manager John Farinacci regarding a “deck for your Thursday meeting” with Board member, Mari[e] Knowles, head of the audit committee: “**Couple of Reminders – 1) FBC had mentioned sensitivity to showing their numbers outside of our world**.” A copy of this email is attached hereto as Exhibit 371.

271.    In 2007, the Defendants’ general counsel denied the Plaintiff’s attorneys’ written request for a meeting with the Board. In 2008, The Defendant’s spokesperson Tom Eidson discussed this topic regarding a conversation with Boston Globe Reporter, Ross Kerber: “**Without commenting specifically on any of the employee’s claims about being prevented from going to the Board of Trustees**.” A copy of this email communication to the Board and others is attached hereto as Exhibit 372-374.

272.    On January 22, 2007, the Plaintiff, in a meeting called by FMR Co. presented her findings regarding the Guidance methodology, which was followed by numerous cover-ups of the issue. On March 5, 2007, CFO Komishane wrote to Mr. Farinacci in FMR Co.: “**What is the context of this request on guidance. The reason I ask is that if it is related to any of the questions that have been raised about guidance recently, I thought we would be getting together to discuss, before anyone went to the Board to discuss**.” Various emails related to the Plaintiff’s Guidance January 22, 200, presentation are attached hereto as Exhibit 375-392.

273.    The Defendants do not provide the Board with sufficient information to fulfill their obligations to the Fidelity Fund’s shareholders, and when information is supplied, such as high fees garnished from the annual contracts, it is justified by the Board which constitutes a

breach of their fiduciary duties in violation of The Investment Act of 1940, Section 36(b). See Exhibit 357-358.

### FIFE CONSPIRATORS AND OTHERS WERE AWARE OF THE IMPLICATIONS OF THE BOARD'S VIOLATION OF THEIR FIDUCIARY DUTIES UNDER SECTION 36(B) OF THE INVESTMENT ACT

274.    Ms. Cadogan implicated Board members and JS Wynant, head of FMR Co's Board Support Group, knowledge of high TA fees, in a weekly "Status Update" to Mr. Komishane on November 21, 2006: "**They received the "deep dive competitive analysis" which indicated <u>we have one of the more expensive TA rates in both our Direct & Intermediary channels</u>. One of the trustees did comment that we did appear to provide higher service in what seemed to JS as <u>trying to justify the higher rates</u>. Other than that little reaction. There was a question from Dennis Dirks as to how he should think about differences of profitability of the varying businesses. <u>JS thought brin[g]ing Brokerage in FP would help with this but I need to find out more from him or John</u>**." "Brokerage in FP" is the aforementioned initiative spearheaded by Mr. Komishane and Ms. Raymond that would allocate even more expenses to the Fidelity Funds and the shareholders further lowering the TA margins. See Exhibit 357-358.

275.    Board members discussing the "Jackie Lawson" matter in terms of the Boston Globe "News Alert," cautioned: "**Ms. Lawson's complaint had the potential to morph into other issues**." Copies of the emails relating to Boston Globe reporter Ross Kerber's questions into Ms. Lawson claims are attached hereto as Exhibit 393-395.

276.    The external advisers to the Fidelity Mutual Fund Board of Trustees were aware of implications of the Board's violation of Section 36(b), when they reacted to the Plaintiff's notification of impropriety with the Annual Fund Reports' false and misleading statements and assurances to the shareholders. Woodrow W. Campbell of Debevoise & Plimpton LLP, in

another "Jackie Lawson" communication: "**Eric, Scott and Ken – I'm baffled that we weren't ccd on this. This is not a routine shareholder complaint and should not be handled as one**." A copy of Mr. Woodrow's email to Eric Roiter is attached hereto as Exhibit 396-398.

## OBSTRUCTION OF JUSTICE – CONTINUATION OF COVER-UPS

277.     Obstruction of justice is considered a crime against justice because it undermines the validity of the legal system. The crime is defined by federal statute as any "interference with the orderly administration of law and justice."

REDACTIONS

278.     The Defendants' document production in 2015, contained many redacted emails relevant to the Plaintiff's claims of fraud where there is no attorney-client privilege, and which could have helped the Plaintiff in prevailing on the merits of her case at trial in 2017. Examples:

- On June 06, 2007, Ms. Connolly wrote to Ms. Cadogan: "**Is there a reason not to copy Jackie on this**?" regarding retention of 12b-1 fees."

- On September 05, 2007, in another communication with Ms. Connolly, Mr. Komishane asked: "**Have you had a conversation with Corp Finance to smooth things over for us?**" Ms. Connolly responded: "**Robin said he was already aware of the situation; said Jackie announced her SEC complaint situation publicly in a meeting he was at a few months ago. They are looking to help us out anyway they can**." Ms. Connolly's emails are attached as Exhibit 399-402.

FALSE INFORMATION TO THIS COURT ABOUT THE DEFENDANTS NOT MEETING WITH PWC REGARDING THE SEC INVESTIGATION

279.     On January 27, 2016, the Defendants filed a 542 paragraph STATEMENT OF UNDISPUTED FACTS in Lawson that is permeated with half-truths, misrepresentations and which contains outright deceitful accounting of events including, but not limited to collusion to deceive this Court. Part V: THE SEC'S INQUIRY INTO LAWSON'S CONCERNS, Paragraphs

533 – 542 made statements regarding PwC's involvement in Ms. Lawson's claims in relation to the SEC.

280. Paragraph 539: "Around **October-November 2008**, the SEC reached out to PwC to discuss Lawson's allegations."

281. Paragraph 540: "**PWC did not speak with anyone at Fidelity prior to meeting with the SEC except to inform Fidelity that it had been contacted. Fidelity did not participate in drafting PwC's presentation to the SEC and did not review it prior to PwC's meeting with the SEC. Trerice Dep. 139-40**."

282. On October 01, 2008, Partner David Trerice, forwarded to JS Wynant an email Mr. Trerice received from Richard DeMarco; PwC – Office of the General Counsel regarding the SEC titled Fidelity/SEC, "(given that there is only an informal investigation by the SEC at this time, the SEC does not have subpoena power.)"

283. Contrary to Paragraph 540, a meeting was set up in response to Mr. Trerice's original notification to JS Wynant, with several people at Fidelity Investments. JS Wynant, Scott Goebel, and Martin McGee met with PwC partner David Trerice "to discuss" the SEC's investigation. Scott Goebel contacted attorneys Jody Forchheimer and Colleen Hankins to "**Let's compare notes**" prior to meeting with PwC. Copies of the email chains refuting the Defendants' claim of not meeting with PwC regarding the SEC investigation is attached hereto as Exhibit 403-419.

FIDELITY'S GENERAL COUNSEL

284. The Defendants' general counsel played an important role in the operation of the FIFE. In addition to Obstruction of Justice, attorneys in the general counsel were the main

instigators of the retaliation campaign against Ms. Lawson, the corruption of the Department of Labor, and the cover-up of various the frauds reported by Ms. Lawson.

285.    Documents turned over by the Defendants, and entries in the <u>Lawson</u> Privilege Log showed that in-house attorney Wendy Zazik, played an expansive role directing the wrong-doings of many other members of the FIFE. For example, Ms. Zazik, instead of human resources, instructed Mr. Komishane regarding Ms. Lawson's reduce compensation. A copy of Mr. Komishane's email regarding consulting with Wendy Zazik about Ms. Lawson's bonus review is attached hereto as Exhibit 420.

286.    The general counsel's collusion with other key parties in the Defendants' RICO enterprise is most evident in the Defendants' Privilege Log produced in 2015, which should not be entitled to the attorney work-product privilege, because the attorneys themselves are the architects and perpetrators of the wrongdoings of the FIFE.

287.    Betsy Connolly, who in addition to Ms. Cadogan became Ms. Lawson's supervisor in May 2007, testified in 2015 that she did not communicate with the Defendants' general counsel regarding the Plaintiff. However, the Defendants privilege log list Ms. Connolly in over one hundred communications with Susan McSwain and Wend Zazik in the general counsel's office, regarding Ms. Lawson.

288.    Ms. Connolly was hired specifically to trump-up charges against the Plaintiff to support termination since Ms. Connolly was not named in the original DOL complaint. Ms. Connolly communicate directly with Ms. Zazik the first day she met Ms. Lawson, and later with human resource person MaryEllen Walsh who in collusion with Ms. Zazik, asked Ms. Connolly to give Ms. Lawson a negative review in July 2007.

PRIVILEGE LOG

289.     The Defendants' privilege log in the <u>Lawson</u> case, is a 99-page, 2,417. There are

forty internal and external attorneys listed with associated "Document Notes" --- "Reflection of

attorney's mental impressions of Guidance Methodology, NF's Retention of 12b-1 Fees, and

Lawson's Internal Complaints."

290.     The Privilege Log, is a road map delineating all the major events, from the time

Lawson wrote her first letter to the general counsel on September 29, 2006, requesting a transfer

out of the BSG, until Ms. Lawson's departure from Fidelity one year later on September 21,

2007, and evidences collusion between the general counsel, human resources and Ms. Lawson's

supervisors.

291.     The privilege log documents were developed in the course of the Defendants'

commission of fraud, and therefore qualifies within the crime-fraud exception.

SPOLIATION

292.     In the case of Lawson v. FMR LLC, Civil Action No. 08-10466-DPW - The

Massachusetts District Court; The Defendants were not forthwith regarding document production

and refused to turn over critical documents.

293.     The Defendants concealed documents to hide the numerous wrongdoings of the

FIFE and to protect themselves in the Lawson litigation.

294.     On September 14, 2007, human resources specialist; senior executive Linda

Stephenson, wrote to Ms. Lawson saying that she would commence an investigation into Ms.

Lawson's rebuttal of her annual review, which included claims of retaliation and securities fraud

committed by the Defendants. Ms. Lawson requested all documents relating to this specific

human resources' investigation.

295. Three of Ms. Lawson's staff; after Ms. Lawson was forced out of Fidelity a week later on September 21, 2007, confirmed they were interviewed by Dawn Hock regarding Ms. Lawson's claims. Ms. Stephenson, in her deposition in 2015, confirmed that Ms. Hock reported into Ms. Stephenson's human resources group. Ms. Lawson's staff member, Mark McManus confirmed this investigation in his 2015 deposition. **Q.** "Where you interviewed by anybody at Fidelity after Jackie left." **A.** "HR."

296. Non-production of the investigation allowed the Defendants' false witnesses' testimonies of revisionist history at trial in 2017, to go unchallenged.

297. The HR investigation was critical to Lawson's burden of proof that others were aware of both securities' fraud violation, and retaliation, and the Defendants had the "duty to preserve" records of the investigation. The Defendants violated Federal Rules of Civil Procedure, Rule 37 (b), "Failure to Comply with a Court Order."

298. The Defendants did not produce any of the plentiful emails the Plaintiff received from co-workers on her last day of employment.

LITIGATION HOLD LETTER

299. The Defendants defiantly refused to produce the <u>Lawson</u> Litigation Hold Letter.

FALSE INFORMATION TO FEDERAL AGENTS

300. In 2015, PwC produced "<u>PwC's Presentation to the Securities and Exchange Commission</u>." On page 12 . . . Reporting of 12b-1 Fees . . . PwC reported to the SEC: "**PwC's services do not include reporting on 12b-1 defensive or offensive fees; therefore, PwC cannot respond with respect to the two issues raised by the SEC concerning these fees**."

301. Ms. Lawson and the BSG she supervised communicated with PwC routinely on Defensive 12b-1s fees, which are included in Fund Profitability.

302.     Furthermore, on February 28, 2007, Ms. Cadogan's email, <u>NF Retention</u>, shows PwC's active participation into the issue. A copy of Ms. Cadogan's "NF Retention" email is attached hereto as Exhibit 421.

303.     Mr. Peppet's October 2008, "REBUTTAL EXPERT REPORT OF RUSSELL F. PEPPET" written in response to Ms. Lawson's deposition in a related case in July 2008 confirmed PwC's involvement:

> Section 2 "Rule 12b-1 Fees Retained by National Financial," "Ms. Lawson claims that Fidelity engaged in an "extensive cover-up of the issue," made "extremely misleading" disclosures to the Board with respect to the issue, and attempted to "hide the issue from the auditors [PwC]."

> Mr. Peppet's "<u>My Opinion</u>" section further stated:

>> "I formed the following opinions based on my review of the underlying facts of the "Retained Rule 12b-1 Fees" issue, including reviewing the documents identified in Ms. Lawson's deposition as relevant and meeting with Fidelity representatives:  A small amount of Rule 12b-1 fees were mistakenly omitted from FP.  As soon as the mistake was recognized, it was corrected and full disclosure was made to the Board.  I found no evidence of a cover-up.  To the contrary, Fidelity identified the error, immediately reported it to the Board, and specified the impact of the error in all relevant years.  **Moreover, PwC was made aware of the situation and participated in remedying the error.**"

304.     On October 15, 2008, two weeks before Mr. Peppet's rebuttal report, Ms. Hankins in the Defendants general counsel office sent Mr. Trerice an email which corroborates Mr. Peppet's statement about PwC's involvement. Hankins' email is attached herein as Exhibit 422.

## **RETALIATION**

305.     After the Plaintiff's attorney sent a September 29, 2006, letter requesting a transfer for Ms. Lawson to a comparable position at Fidelity Investments, the FIFE actively began creating and fabricating human resource issues to justify taking adverse employment action against Ms. Lawson. On May 2007, Human Resources persons Beth Webster and Mary Ellen Walsh communicated: "**Are we any closer to Jackie leaving**," "**Hopefully but I don't**

**want to get to[sic] far ahead of myself**." A copy of Ms. Webster and Ms. Walsh email is attached hereto as Exhibit 423-424.

306.     Ms. Lawson had an impeccable employment record prior to her attorney sending the September 29, 2006, letter, with no items in a human resources log. After Ms. Zazik opened a case against Ms. Lawson on October 10, five days after Ms. Lawson met with the general counsel to voice her concerns about the independent governance of the BSG, the Defendants placed 57 trumped-up charges in Ms. Lawson's human resources file, over a one-year period.

307.     OSHA's January 28, 2008, memorandum from Kristen Rubino, Whistleblower Investigator, to Carole Horowitz, Regional Supervisory Investigator, noted that: "**Respondent did not offer a defense on the subsequent alleged adverse actions at OSHA's request**." A copy of the report is attached hereto as Exhibit 425-428.

308.     The FIFE's retaliation campaign . . . by its nature . . . is supported in part by the language in the Department of Labor's communication to external counsel, Eugen Scalia: "Dear Mr. Scalia:" "**The Complaint also will be dismissed if Complainant has made a prima facie showing, but we determine that you have demonstrated by clear and convincing evidence that you would have taken the same unfavorable personnel action in the absence of the complainant's protected activity**."

309.     The "FIFE's" retaliation campaign includes, but is not limited to:

a.     Falsified Ms. Lawson's personnel record;
   i.     Insubordination accusations and oral warnings, coinciding with Ms. Lawson's reported issues of substantive concern, example, the questionable "Guidance" methodology, and retention of 12b-1 fees.

b.     Attempts to discredit Ms. Lawson's work;

c.     Sabotaging Ms. Lawson's effort to fill a critical post in her group;

     d.      Understaffing the BSG, increasing Ms. Lawson's workload, while simultaneously demanding the same level of production;

     e.      Constructively discharging Ms. Lawson.

NEGATIVE REVIEW

310.     On July 17, 2007, Mr. Komishane and Ms. Cadogan assigned Ms. Lawson Fidelity Investments' lowest rating for her annual review; "N" for "Needs Improvement."

FIDELITY'S RETENTION OF FUND-PAID 12B-1 FEES

311.     Lawson's privilege log on this topic highlights the seriousness of the violation, and Fidelity's knowledge of wrong doing.

312.     Ms. Lawson reported this securities fraud to the DOL, and the SEC *after* the FIFE in retaliation for Ms. Lawson filing her first claim to the DOL, blamed Ms. Lawson for National Financial's failure to disclose the retention of 12b-1 fees, by falsely communicating to the Board of Trustees that failure to record the revenue was the fault of the Board Support Group supervised by Ms. Lawson.

313.     The Defendants committed securities fraud by retaining 12b-1 fees in violation of the Securities and Exchange Commission Rule 12b-1. This securities fraud involves Fidelity Investments' company National Financial Correspondent Corporation (NFCC), referred herein as "National Financial." National Financial retained fund-paid 12b-1 fees from 2003-2006, without approval from The Board of Trustees.

314.     National Financial intentionally did not disclose the retention of these fees to any party, including FMR Co. and Ms. Lawson, who had a responsibility to report this fund-paid fee in Fund profitability analysis performed by the BSG. To avoid detection, this illegal revenue was buried in the general ledge by National Financial management.

315.    The Defendants acknowledged the Plaintiff's concerns: "**It is believed Jackie's motivation may be that she is concerned that she or her group could be blamed** ---." See Exhibit 51-53.

## VARIOUS RELEVANT PARTIES ADVISED AGAINST THE RETENTION

316.    On December 12, 2006, Henry L. Murphy emailed Laura Lynn Morrissey and Tony Cleary, two National Financial vice presidents:

> "LL and Tony – I spoke with Jen and she mentioned these two points of emphasis, which are consistent with points stressed during our call earlier this afternoon:"
>
> - "Fidelity has made representations to Fund Companies and to its regulators as to how the MAS program works and specifically representing that **NFS will not withhold 12b-1's from its correspondents.** These representations include written representations."
> - "To revise prior representations would require Fidelity to amend current agreements in place with Fund Companies as well as to amend representations made to our regulators, which is not a path that Fidelity is interested in undertaking." See Exhibit 54-61.

317.    On November 02, 2017, Steve Jonas repeated his 2015 deposition testimony that his recommendation to the Chairman, Mr. Johnson . . . after the issue was brought to his attention by Fidelity attorneys . . . was to repay the funds:

> "Various attorneys within the organization had looked at it along with financial participants, and they brought it to my attention because it was viewed as a gray area as to whether the standing authorizations from the Board cover it." "My determination was that the standing authorization didn't clearly cover this one, and so my recommendation was that we should bring it to the Board and repay those fees."

318.    Fidelity Funds' in-house attorneys, Stuart Fross and Eric Roiter, agreed with Steve Jonas' assessment and recommendation, that was presented to the Chairman on December 05, 2006. A copy of the email communication is attached hereto as Exhibit 429.

<u>DECEITFUL COMMUNCIATION TO THE BOARD REGARDING THE 12b-1 FEE
RETENTION</u>

319.     Three memos were presented to the Board on March 7, 2007 relating to the topic

of National Financials' retention of 12b-1 fees.

320.     In one March 7, 2007 memo "<u>Retention of Fund-paid 12b-1 Fees on the Cash

Management Funds</u>, Fidelity informed the Board that: "National Financial incurs expenses and

performs traditional distribution activities that supports its retention of 12b-1 fees."

321.     National Financial did not perform activities to justify retaining shareholder fund-

paid 12b-1 fees. Attorney, Natalie Kavanaugh inappropriately manufactured the justification

activities for retaining the 12b-1 fees. Ms. Lawson created the National Financial Fund

Profitability model, and the business had no activities, nor incurred any requisite distribution

expense to warrant retention of 12b-1 fees. This was also confirmed by Ms. Cadogan on August

01, 2007, regarding 12b-1 Reporting & Internal Audit: "**This review and confirmation is

particularly important for those 12b-1 activities which my team currently does not have

direct insight**." A copy of Ms. Cadogan's August 01, 2007, email is attached hereto as Exhibit

430.

322.     FMRCo/General Counsel's handwritten investigative notes "<u>12b-1 Fee Issue</u>,

illuminates the immorality of the retention: "**We justify the high 12b-1 by saying

"intermediaries required it" yet we keep it;**" a statement that confirms that National Financial

is not an intermediary, for whom12b-1 fees are intended to compensate. This comment on hand

written investigative notes is attached hereto as Exhibit 431.

323.     The Defendants April 13, 2005, memo to the Board of Trustees also clarified

National Financial ineligibility to receive 12b-1 fees: "**The acquisitions described above are

not expected to have a major impact on Fidelity fund flows given that NFCC is <u>product</u>**

**neutral (NFCC offers services and tools to the client, <u>but does not market specific</u>**

**<u>investment products</u>.")**

324.    The major issues with this securities fraud are: (1) National Financial

disobedience to the regulators' forbidding this practice; (2) National Financial failure to disclose;

(3) The ensuing massive cover-up by FMRCo and the general counsel; (4) Misleading

communication in the March 2007 Board memo; (5) The Chairman, Edward Johnson's failure to

disclose the issue to the Board and his failure to reimburse the funds as recommended by the

Fund's attorneys.

325.    As of the filing of this Complaint Fidelity Investments is still retaining fund-paid

12b-1 fees.

<u>CONSPIRACY OF SUBORNATION OF PERJURY</u>

326.    On November 12, 2017, attorney Kettlewell in his closing argument made the

following statement:

> "Remember, Ms. Lawson accused Mike Freeman of implementing an
> unapproved methodology regarding the back office at the request of the people in
> the PI group. What did he tell you? He told you he didn't do it. He denied doing
> it. And more importantly, he told you he could never have done it. Because as he
> and Harris Komishane explained to you he did not have access to the general
> ledger and the books of Fidelity at the Board Support Group. Neither did the
> people in the Personal Investments group. That was confined access, the general
> ledger was confined to people in the accounting group. That's called a control.
> Mike Freeman could never do anything unilaterally on his own without the
> general accounting group's knowledge and approval, and he didn't do it in this
> case. He told you that. She called him as a witness. He told you that." (Closing
> Argument, p. 21, A. 803).

327.    The Defendants knew that the BSG was the only group with authorization to

implement methodology changes, and not the accounting group. The FIFE orchestrated Mr.

Freeman's, Mr. Komishane's and attorney Kettlewell's perjured statement on this topic,

specifically to discredit the Plaintiff.

328.     Implementing methodology changes is a major function of the Board Support Group. It is a controlled process called Business Unit Data Analyst (BUDA) responsibilities, supervised by Ms. Lawson. The system is password protected and changes can only be made by approved personnel granted authorization by Ms. Lawson. The BSG BUDA responsibilities, BSG 2006 Goals under "Monthly/Quarterly FP Processing" are attached hereto as Exhibit 432-436.

329.     Mr. Freeman ordered one of Ms. Lawson's BUDAs, Elizabeth Yash, to make the unapproved changes in January 2006, in Ms. Lawson's absence from the group. Mr. Freeman's involvement is attached hereto as Exhibit 437.

PERJURY

330.     Attorney Kettlewell, in a Lack of Candor to the Tribunal, told the jury: "**So what happened when she walked out the door? She received $90,000 from Fidelity**."

331.     Ms. Lawson received $90,000 in March 2007, six months before her departure, for Performance Options shares bought and owned by Ms. Lawson. The $90,000 is a payout of shares awarded to Ms. Lawson by the Chairman, Edward Johnson, seven years previously, that became fully vested December 31, 2006. The routine payout in March 2007, is not related to Ms. Lawson's departure from Fidelity as the Defendants misrepresented to the jury. A copy of Mr. Johnson's shares award letter to "Dear Jackie" on June 22, 2000, is attached hereto as Exhibit 440-445.

332.     In another instance of dishonesty, attorney Kettlewell told the jury that "even Ms. Connors, Ms. Lawson's friend" did not give Ms. Lawson a raise. Ms. Connors, who was not Ms. Lawson's friend at the time she was her supervisor, gave Ms. Lawson an "E" for "Exceeds Expectations" and a salary increase. Ms. Connors and Ms. Lawson became friends after Ms.

Connors became ill with cancer and reached out to Ms. Lawson for support, years after she left the Defendants' employment. Ms. Connors affidavit accounting her interaction with attorney Kettlewell is attached hereto as Exhibit 446-447.

### WITNESS INTIMIDATION AND WITNESS TAMPERING

333.    Fidelity Investments intimidate witnesses; both current and former employees, through the enforcement of mandatory employee signed Confidentiality Agreements, and Contracts of Adhesions.

334.    In 2008, after Ms. Lawson filed a claim in this Court, The Defendants'' external counsel, Eugene Scalia, ominously communicated that Ms. Lawson would be punished . . . insinuating that Ms. Lawson would be sued by Fidelity Investments for violation of her mandatory signed Confidential Agreement with Fidelity Investments if she discussed Fidelity Investments business with the press.

335.    In 2015, prior to their depositions, Fidelity's internal attorney, Leslie Blickenstaff, contacted both of Ms. Lawson's material witnesses; Judith Anderson and Agnes Connors, with requests to meet with Fidelity attorneys, after the Plaintiff's attorneys notified the Defendants' attorneys that these two witnesses would testify on Ms. Lawson's behalf.

336.    Fidelity attorney Leslie Blickenstaff, called Ms. Anderson at home, threatening and intimidating her.

337.    Attorney Blickenstaff told Ms. Anderson she had a legal obligation to assist Fidelity in litigation, calling Ms. Anderson's attention to the separation package Ms. Anderson signed when she was laid-off. When Ms. Anderson informed attorney Blickenstaff that she was a friend of Ms. Lawson, and a witness for Lawson, attorney Blickenstaff emphasized seventy thousand dollars Fidelity Investment paid to Ms. Anderson at the time of her separation from

Fidelity Investments, and referenced the document signed by Ms. Anderson threateningly. Ms.

Anderson's affidavit of the event is attached hereto as Exhibit 448-451.

338.    Attorney Victoria Steinberg further attempted to intimidate Ms. Anderson during

her deposition in 2015.

> Q. Okay. And why did you leave Fidelity? **A. I was part of a layoff that occurred from a restructuring.**
> Q. When did that occur? **A. That was in 2002.**
> Q. Were you offered severance in connection with your separation? **A. Yes, I was.**
> Q. And you accepted that offer, correct? **A. Yes, I did.**
> Q. Okay. Is it your recollection that you signed your separation agreement in October 2002? **A. That is correct.**
> Q. And did you understand that Fidelity agreed to pay you certain severance in exchange for promises you made. **A. That is correct.**
> Q. Okay. Am I correct that you were paid six months of severance which totaled 55,600 in severance? **A. I don't recall the exact amount.**
> Q. Okay. Do you recall that you received a bonus and certain shares in connection with your separation? **A. yep.**
> Q. And do you recall that you agreed to cooperate in litigation in that agreement. **A. Agreed for litigation. Yes.**
> Q. Okay. And several months ago did you receive a call from Fidelity pertaining to this litigation? **A. It was just recently.**
> Q. Okay. At some time – **A. Yes**. Q. – within the past few months did you receive a call from Fidelity – **A. Yes. Yes, I did**. Q. – asking for your consultation and cooperation in connection with this litigation. A. **They asked me to come in to speak with Fidelity without legal counsel.**
> Q. What do you recall about that phone call. **A. That I was surprised that I received it. I – I remember signing the letter. I couldn't find a copy of it but I was offered that the person, I think it was Leslie who called me, saying that she would send me a copy, and I ask is this in regard to the deposition. And she said no, we want to [sic] you to come in and talk with Fidelity privately. And I said no, I will, I will cooperate with Fidelity at the deposition, but that I wanted my own counsel, that I was a good friend of Jackie Lawson's and that I wanted counsel.**
> Q. Okay. At that point did you call Ms. Lawson's counsel. **A. I called Jackie and I said –**
> Q. Okay. And what did she say? **A. "Let me call Bob."**
> Q. And what did you say. **A. Okay. Let me know.**
> A. Did you recount to her the conversation? **A. yes.**
> Q. You say you were surprised by the call. Why were you surprise? **A. That 13 years later, from a contract I had signed regarding my own employment, that**

**you would try to get me to say things for Fidelity that were against a good friend.**
Q. Who asked you to say things for Fidelity? **A. That is what I am assuming cooperation means, that you are going to take Fidelity's standpoint.**

A copy of the relevant pages of Ms. Anderson's deposition is attached hereto as

Exhibit 452-454.

339.    Agnes Connors received a similar message on her home phone from attorney

Leslie Blickenstaff requesting her presence to meet with the Defendants' attorneys. See Exhibit

446-447.

340.    Erik Olsson, one of Ms. Lawson's staff member, with first-hand, valuable

contribution to Ms. Lawson's claim of fraud, and retaliation, was contacted by Ms. Lawson's

attorney to testify at trial. Mr. Olsson vehemently refused to testify, stating that if he was

subpoenaed to testify, he would have to "lie" against Ms. Lawson.

341.    Ms. Lawson stated in her claim that one of her staff members opined on Ms.

Cadogan's first day as Ms. Lawson's boss, that: "She came gunning for you" after witnessing

Ms. Cadogan's aggressive and abusive behavior towards Ms. Lawson. During discovery, the

Defendants specifically asked in their interrogatories for the name of the person who made that

specific comment.

342.    Joe Guinta, another person with first-hand knowledge of the securities fraud

committed by Fidelity Investments, and the retaliation suffered by Ms. Lawson refused to testify

on Ms. Lawson's behalf after he was identified as the speaker of the comment.

Steve Jonas confirmed in his deposition that Fidelity enforces Contract of Adhesion.

**Q.** You alluded to the fact that you left in December of 2006, did you have a separation agreement with Fidelity? **A. Probably**
Q. Did you have an opportunity to review that agreement since learning about this deposition notice? **A. I have it in my possession. I didn't review it, no.**

Q. Do you know whether that agreement requires you to cooperate with Fidelity in all litigation? **A. I expect it does.**
Q. Is that what you're doing here today? **A. I'm trying to.**

The relevant page of Mr. Jonas' deposition transcript is attached hereto as Exhibit 455-

457.

343.     Ms. Steinberg's and Mark. McManus interaction at his deposition is

demonstrative of Fidelity's choke-hold on current employees.

Q. Are you represented by counsel today? **A. No, I don't think so.**
The witness: **"Yes?"**
**A. I don't have personal counsel. She's Fidelity.**
Q. Okay. Let me put the question. Are you represented by counsel? **A. Yes.**
Ms. Steinberg: Yes, by Fidelity counsel**.**
**A.  I'm going to need some legal advice, because I don't know – I don't have a lawyer, a personal lawyer. I am here with Fidelity counsel.**

Later in the deposition Mr. McManus mentioned meeting with Leslie Blickenstaff.

Relevant pages of Mr. McManus' deposition transcript are attached hereto as Exhibit 458-460.

## **BRIBERY**

344.     The Defendants awards huge bonuses to the FIFE conspirators.

345.     Linda Stephenson attempted to bribe Ms. Lawson in March 2007, with monetary

payout, stating that if Ms. Lawson was not interested in the money, then Ms. Lawson could

donate said money to charity. Ms. McSwain reported and characterized the three-hour meeting as

Ms. Stephenson effort to build "**rapport with the employee**."

346.     Mr. Freeman accepted a promotion to Vice President in 2007, on the

recommendation of Jean Raymond, around the same time he was urging Ms. Lawson to

acquiesced to the retail finance group regarding the new Guidance methodology for the phone's

organization.

347.     Kate Steed accepted a promotion working directly for Jean Raymond the Monday after testifying against Ms. Lawson at trial in November 2017.

348.     Ms. Connolly testified at her deposition that Harris Komishane promised her a promotion in the near future replacing him in his current position as head of Fidelity Brokerage Company Shared Services.

349.     Ms. Cadogan was promoted to Vice President of finance soon after Ms. Lawson's departure from Fidelity Investments.

350.     Harris Komishane was promoted to higher positions in the organization soon after Ms. Lawson's departure from Fidelity Investments.

351.     Jean Raymond was promoted to higher positions in the organization soon after Ms. Lawson's departure from Fidelity Investments.

352.     Russe; Peppet testified that he was paid $900 dollars an hour and he admitted to billing many hours to the Defendants.

## FEAR OF REPRISAL

353.     Prior to creating the new result-based methodology, Janice Smaga had been demoted from a vice president to a senior director under Jean Raymond's management. When asked why she had changed the Guidance methodology, Ms. Smaga's responded: "When a CFO ask me to do something, I am going to do it."

354.     Katherine Steed, had also been demoted, and later promoted to vice president by Harris Komishane.

355.     Mr. Jonas testified at his deposition that he accepted a separation package from the Defendants in the same month, December 2006, that he disagreed with the Chairman Mr. Johnson.

## SUMMARY OF ALLEGATIONS

356.   The Defendants went to great lengths to stop the scheduled OSHA investigation.

357.   Ms. Horowitz's October 18, 2007, prophetic statement to Ms. Tolek: "**I have a hunch that if we continue to find that Fidelity is covered, they will try to settle with Lawson now that she has resigned. They will not want this decided against them**" is proof that the Plaintiff had a strong possibility of prevailing on her claims if OSHA had conducted the scheduled investigation real-time into the Plaintiff's Sarbanes-Oxley complaint, instead of not prevailing 10 years later in a jury trial.

358.   The contentious Guidance methodology, and the misrepresentation of 'free' investment advice, would have been investigated, and the Mass-Marketing Fraud most likely would have been discovered by OSHA, terminated, protecting Class members as early as 2007.

360.   As described herein, the Defendants unbecoming behaviors are normal ways of conducting business, throughout the relevant time period, and contradicts the image that Fidelity Investments continues to portray on the surface to their employees, their shareholders, the courts, and the public.

## INJURY TO CLASS MEMBERS

361.   The monthly account servicing fees collected by the Defendants from the Fidelity Funds, and ultimately the shareholders are excessive in violation of Section 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b).

362.   The Defendants accentuated and ceded the harm to the Fidelity Funds' shareholders in their May 2008, "MEMORANDUM IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS FMR LLC AND FIDELITY BROKERAGE SERVICES LLC, "**that a subcontractor exaggerated its costs in a manner that caused a public company – the Funds**

**– to overpay for the subcontractor's services. Self-evidently, however, "shareholder fraud" does not include overcharging a public company on a contract, even if that overcharge ultimately affects the value of shareholders' holding."** See Exhibit 6-25.

363.    The Defendants violates their fiduciary duties by not sharing the benefits of economies of scale with their shareholders.

364.    As a direct and proximate result of the actions described herein the Plaintiff and Class Members have suffered damages, including but not limited to, lower value of shareholder holdings; lower return on investments.

## DIRECT INJURY TO THE PLAINTIFF

CIVIL LITIGATION LOSS

365.    The Plaintiff lost on the merits of her case on November 14, 2017, resulting from the predicate offenses of the FIFE, including, but not limited to those acts that are stated with particularity in the Obstruction of Justice and Witness Intimidation and Tampering sections herein.

366.    The Defendants and their conspirators many false and misleading statements in this Court caused and continue to cause substantial damages to the Plaintiff.

INTERFERENCE WITH A GOVERNMENT AGENCY INVESTIGATION

367.    The Defendants caused considerable harm to the Plaintiff, when they interfered with the scheduled November 2007, OSHA investigation into Ms. Lawson's complaint. The investigation was scheduled to take place at an opportune time for the Plaintiff when the events surrounding her claims were fresh and could be easily proven, rather than in a trial more than ten years after the events occurred.

OCCUPATIONAL HARM

368.    The Department of Labor played a critical role in enhancing the objectives of the FIFE and bears some responsibility for Ms. Lawson's loss of employment, long-term suffering, and lack of remedies.

369.    In 2015, Ms. Lawson experience more injury when OSHA formally refused to testify at trial.

ECONOMIC LOSS

370.    As of November 2017, the Plaintiff's back-pay was conservatively estimated at $3.8 million dollars.

REPUTATIONAL HARM – DEFAMATION OF CHARACTER

371.    The Defendants repeatedly stated to the DOL and the federal courts and the media that the Plaintiff was an underperformer. However, the Defendants have factual data that belies this statement. Ms. Lawson had a stellar performance history as confirmed by CFO, Katherine Steed in November 2017: "**Because she was a good employee. She was a good manager. She knew her stuff.**"

372.    On May 8, 2008, The Boston Globe, in an article titled "Fidelity suits may expand whistle-blower law," reported that: "In a motion filed yesterday Fidelity called [Lawson's] claims meritless" and quoted Fidelity's untruthfully statement: "**Unfortunately, there are employees who attempt to use Sarbanes-Oxley's protections as leverage against their employers in an effort to shield themselves from legitimate employment action. That is what happened here**."

373.    In 2014, Bloomberg newspaper, after the Supreme Court's ruling in Lawson, cited unnamed sources about Ms. Lawson and that there were "**issues around performance**."

374.     On September 26, 2018, the Defendants in their Reply Brief to the First Circuit Appellate Court made unsubstantiated, and falsified statements including, but not limited to: "**When raising these allegations, Ms. Lawson demanded money or a promotion, or some other compensation.**" This statement is refuted by Fidelity internal counsel, Susan McSwain, who told Ms. Lawson's attorney on July 25, 2007: 'While it is not my typical practice in employment maters to put an offer on the table in the **absence of a specific demand from an employee.**"

375.     The false statements about the Plaintiff's "underperformance" and other disparaging remarks were made in a malicious manner to cause harm to the Plaintiff's reputation.

376.     The Defendants by sharing damaging falsehoods about the Plaintiff to the courts and media, clearly intended harm. The Defendants' defamation of character contributed to the Plaintiff's loss on the merit of her case in November 2017, and her ability to find a job in her field of experience. The Defendants smear campaign in the media harmed the Plaintiff.

377.     Ms. Steed acknowledged the Defendants harm to Ms. Lawson in her signed declaration that Ms. Lawson "**threw away her career**" supposedly by becoming a whistleblower.

ATTORNEY FEES

378.     Ms. Lawson's attorney fees were incurred because of the illegal activities and violations of the FIFE as described in this Complaint.

## INJURY TO COMPETITORS

379.     The Defendants' media blitz of "Free Guidance" when almost half this expense is allocated to shareholders afforded the Defendants an unfair advantage over their competitors who do not allocate investment advice operation costs to their shareholders.

## CLASS ACTION ALLEGATIONS

380.    Pursuant to Federal Rules of Civil Procedure Rule 23, Plaintiff, on behalf of

herself and all other similarly situated, seeks to certify a national Class defined as follows:

> All persons in the United States with retail brokerage accounts at Fidelity
> Investments from January 01, 2007 to the present, whose accounts were subjected
> to the Defendants' fraudulent excessive account servicing fees (hereinafter the
> "Class" or Class Members").

381.    Fidelity Investments is the largest mutual fund company in the United States, and

as a result of the Defendants' false advertising, the company as achieved significant growth over

the years, and the Members of the Class are so numerous that joinder is impracticable and would

involve hundreds of thousands, of individual actions.

382.    The identities of the individual Members of the Class are ascertainable through,

among other things, the Defendants' internal records. Members of the Class may be notified of

the pendency of the Class Action by numerous reasonable means, including mail, e-mail,

internet, publication and other means.

383.    Many common questions of law and fact exist over many issues affecting

individual Class Members, in addition to the existence of questions of law and fact specific to the

Plaintiff. Common issues of law and fact include, but are limited to:

- Whether the Defendants engaged in deceptive and fraudulent acts and
  practices described herein;

- Whether the Defendants engaged in conduct actionable under the RICO
  statute;

- Whether the Defendants, Plaintiff, and Class Members were and are each
  a "person" as that term is defined in 18 U.S.C. § 1961(3);

- Whether the "Fidelity Investments Organized Crime Enterprise" is an
  association-in-fact within the meaning of 18 U.S.C. § 1961(4);

- Whether the Defendants were, and are, a "person" which conducted the affairs of the "Fidelity Investments Organized crime Enterprise," through the "pattern of racketeering activity;"

- Whether the Defendants engaged in a "pattern of racketeering" activity as defined in 18 U.S.C. § 1961(5);

- Whether the Defendants has engaged in a "racketeering activity," indictable under any of the provisions of 18 U.S.C. § 1341 (mail fraud) and §1343 (wire fraud);

- Whether the Defendants has engaged in a "racketeering activity," indictable under any of the provisions of 18 U.S.C. § 1503 (obstruction of justice);

- Whether the Defendants has engaged in a "racketeering activity," indictable under any of the provisions of 18 U.S.C. §§ 1512 and 1513e (witness tampering);

- Whether the Defendants has engaged in a "racketeering activity," indictable under any of the provisions of 18 U.S.C. § 1514A;

- Whether the Defendants has engaged in a "racketeering activity," indictable under any of the provisions of 18 U.S.C. §1517 (obstructing examination of financial institution);

- Whether the Defendants has engaged in a "racketeering activity," indictable under any of the provisions of 18 U.S.C. §1623 (false declarations before grand jury or court);

- Whether the Defendants has engaged in a "racketeering activity," indictable under any of the provisions of The Investment Advisers Act of 1940;

- Whether the Defendants has engaged in a "racketeering activity," indictable under any of the provisions of The Investment Company Act of 1940;

- Whether the Defendants has engaged in a "racketeering activity," indictable under any of the provisions of The Dodd-Frank Act of 2010;

- Whether the Defendants has engaged in a "racketeering activity," indictable under any of the provisions of The Securities Exchange Act of 1934;

- Whether the Defendants has engaged in a "racketeering activity," indictable under any of the provisions of The Lanham Act;

- Whether the Defendants has engaged in a "racketeering activity," indictable under any of the provisions of Massachusetts General Law;

- Whether the Defendants has engaged in a "racketeering activity," chargeable under any of the provisions of Massachusetts State Laws;

- Whether the Plaintiff and each Member of the Class were and are each a "person injured in his or her business or property by reason of a violation of" RICO within the meaning of 18 U.S.C. § 1964 (c).

- Whether the Plaintiff and each Member of the Class have been injured in their business or property as direct and proximate result of the Defendants' illegal conduct in violation of 18 U.S.C. § 1964 (a);

- Whether the Plaintiff and each Member of the Class have been injured in their business or property as direct and proximate result of the Defendants' illegal conduct in violation of 18 U.S.C. § 1964 (b);

- Whether the Plaintiff and each Member of the Class have been injured in their business or property as direct and proximate result of the Defendants' illegal conduct in violation of 18 U.S.C. § 1964 (c);

- Whether the Plaintiff and each Member of the Class have been injured in their business or property as direct and proximate result of the Defendants' illegal conduct in violation of 18 U.S.C. § 1964 (d);

- Whether the Defendants are liable for damages to Plaintiff and Class Members for conduct actionable under the RICO statute;

- Whether the Defendants knowingly and willingly corrupted two government agencies; the Department of Labor, and the Securities Exchange Commission, allowing the Defendants to evade charges under The Sarbanes-Oxley Act of 2002;

- Whether the Defendants' scheme to defraud was reasonably calculated with the intent to deceive and defraud persons of ordinary prudence and comprehension, including Class Members;

- Whether the Defendants are liable for damages to Plaintiff and Class Members for conduct actionable as a breach of fiduciary duty;

- Whether the Defendants are liable for damages to Plaintiff and Class Members for conduct actionable as a breach of contract;

- Whether the Defendants are liable for damages to Plaintiff and Class Members for conduct actionable as breach of the implied covenant of good faith and fair dealing.

384.    Plaintiff's claims are typical of the claims of the proposed Class, and Plaintiff will fairly and adequately represent, and protect the interests of the proposed class. Plaintiff does not have any interests antagonistic to those of the Class.

385.    Pursuant to the duties of the court, the Plaintiff requests that this Court appoint competent and experienced counsel in the prosecution of this type of litigation.

386.    The Defendants have acted on grounds generally applicable to the Class by engaging in aggressive uniform national marketing and advertising campaign containing false, deceptive, and fraudulent representations, and inadequate disclosures, thereby making injunctive or declaratory relief applicable with respect to the Class as a whole.

387.    A class action is also superior to other available methods for the fair and efficient adjudication of this controversy because Class Members number in the hundreds of thousands, and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class members to prosecute their claims individually. Trial of Plaintiff's and Class Members' claims is manageable, and economies of time, effort, and expense will be fostered and uniformity of decisions will be insured.

388.    Most individual Class Members have little ability to prosecute an individual action due to the complexity of the issues involved in this litigation and the significant costs attendant to litigation on this scale compared to the damages suffered by individual Class Members.

389.    Unless a class is certified, the Defendants will continue to unlawfully engage in acts of aggressive uniform national marketing and advertising campaign containing false, deceptive, and fraudulent representations, and inadequate disclosures.

390. Unless a class is certified the Defendants will continue to illegally operate the Mass-Marketing Fraud. Unless a class-wide injunction is issued, the Defendants conducting unfair business practices will continue to violate many laws enacted to protect shareholders against fraud.

## STATUTE OF LIMITATIONS – COMPLIANCE, ACCRUAL, FRAUDULENT CONCEALMENT, CONTINUING VIOLATION AND EQUITABLE TOLLING

391. This Class Action suit and RICO Complaint complies with the four-year Statute of Limitation accorded by law to bring such a claim against the Defendants.

392. The Plaintiff's loss of her civil litigation against the Defendants was not known until November 14, 2017, when judgment was entered against her by this Court.

393. The corruption of The Department of was not known until November 14, 2018 when the Plaintiff received FOIA documents.

394. The Plaintiff could not have known of the Defendants RICO "enterprise," the "FIFE," until near the filing of this Complaint.

395. The FIFE RICO conspiracy began unearthing in 2015, when the Defendants produced the substantive evidentiary documents included herein, during the discovery phase of civil litigation; Lawson v. FMR LLC, Civil Action No. 08-10466-DPW, in Massachusetts District Court. The Plaintiff could not have known of the Defendants' RICO conspiracy until near the filing of this Complaint.

396. Multiple predicate offenses of the FIFE constituting the "pattern of racketeering activities" were conducted between 2015 and 2017, during the discovery and trial phase of Lawson v. FMR LLC, Civil Action No. 08-10466-DPW, in Massachusetts District Court, respectively.

397.     The Plaintiff continues to suffer occupational harm and the negative impact of defamation of character caused by the FIFE.

398.     The Class members did not know, and could not have reasonable known prior to this Complaint of the Defendants, RICO enterprise; Fidelity Investments Fraudulent Enterprise ("FIFE.")

399.     Class Members did not know, and could not reasonable have known of the Mass-Marketing Fraud currently operated by the FIFE.

400.     For the reasons alleged herein, Members of the Class are still unaware that they have been, and continue to be injured by the Defendants' deceptive continuing fraudulent conduct.

401.     The FIFE RICO conspiracy continues today, and the Defendants are still currently advertising "free" investment advice and operating the Mass-Marketing Fraud.

402.     This RICO Class Action Complaint also meets the eligibility for equitable tolling because the FIFE covered-up, and are still covering-up their crimes. The statute of limitations applicable to any claims the Plaintiff or Class Members have brought or could bring as a result of the unlawful and fraudulent concealment and course of conduct, has been tolled as a result of the Defendants' fraudulent and on-going active concealment.

403.     The Defendants' unfair business practices, including, but not limited to the operation of the Mass-Marketing Fraud, were inherently self-concealing, and the Defendants has repeatedly elected to continue the concealment of its deceptive practices in order to charge the Fidelity Funds' shareholders excessive servicing fees.

404.     The Defendants and FIFE conspirators continue to fraudulently conceal their misconduct by committing many acts of perjury and misstatements at the Lawson trial in 2017.

405.     To further the active and fraudulent concealment of this deception, the Defendants employed and continue to employ many of the predicate offenses described in this Complaint.

## CONTINUATION OF THE FIDELITY INVESTMENT FRAUD ENTERPRISE (FIFE) AND CONTINUATION OF THE MASS-MARKETING FRAUD

406.     As of the time of this Compliant, the Defendants are still operating the Mass-Marketing Fraud; the Defendants are still deceptively advertising "Free" investment advice.

407.     The Defendants are still violating their fiduciary duties to the Fidelity Funds shareholders by allocating Distribution costs to the Fidelity Funds' as servicing costs.

408.     In November 2017, Marie Knowles; Independent Board of Trustee member and head of the Audit Committee, testified that the Fidelity Mutual Fund Board of Trustees approved the Guidance methodology, confirming that The Board sanctions the illegal practice of allocating investment advice expenses to the Fidelity Funds shareholders as a servicing expense, and violates their fiduciary duties.

409.     Ms. Knowles, Fidelity Mutual Fund Board of Trustees member, testified in her capacity as head of the Audit Committee for the Fidelity Funds as a witness for the Defendants at Lawson trial on November 08, 2017, evidences that the FIFE still operates as a continuing unit.

410.     Mr. Freeman's and Mr. Komishane's orchestrated testimony capitalized on by attorney William Kettlewell in his closing arguments evidences that the FIFE still operates as a continuing unit.

411.     Mr. Peppet, the expert witness for the Defendants in the Bennett litigation that was settled in 2008, was also the testifying witness in the Lawson case evidences that the FIFE still operates as a continuing unit.

412.    The Defendants' Response brief to the First Circuit Appellate Court, in September 2018, false and unsubstantiated statements of character assassination of Ms. Lawson evidences that the Defendants are still acting on behalf of the FIFE.

413.    The SEC's refusal of Ms. Lawson's FOIA request two days after the First Circuit affirm the district court's judgment, evidences that the SEC is still an active conspirator of the FIFE.

414.    As of the filing of this Complaint, the Defendants continue their racketeering activities.

415.    As of the filing of this Complaint, the Defendants still poses a threat to employees such as the Plaintiff, in that any employee of the Defendants that have knowledge of any fraud committed by the Defendants, and report such fraud to the agencies will received similar adverse treatment as Ms. Lawson as described herein.

## COUNT I

### Violations of CIVIL RICO: 18 U.S.C. § 1962(a)

416.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

417.    This cause of action asserts claims against the Defendants for violations of 18 U.S.C. § 1962(a) for receiving income derived, directly or indirectly, from a pattern of racketeering activity.

418.    This cause of action further asserts claims against the Defendants for violations of 18 U.S.C. § 1962(a) for investing, directly or indirectly, a part of such income, or the proceeds of such income, in the operation of the Fidelity Investments, which is engaged in activities which affect interstate commerce.

419.     During the class period, the Defendants, Plaintiff, and Members of the Class were each a "person," as that term is defined in 18 U.S.C. § 1961(3).

420.     During the Class Period, Plaintiff, and each member of the Class, were and are each a "person inured in his or her business or property by reason of violation of" RICO within the meaning of 18 U.S.C. § 1964(c).

421.     During the Class Period, the Defendants were, and are, a "person" who conducted the affairs of the "Fidelity Investments Fraud Enterprise" described below, through the "pattern of racketeering activity" described below, and unlawful under 18 U.S.C. 1961. While the Defendants participates in the Fidelity Investments Fraud Enterprise, it has an existence separate and distinct from the enterprise. Further, the Fidelity Investments Fraud Enterprise is separate and distinct form the "pattern of racketeering activity" in which the Defendants has engaged and is engaging.

422.     During the Class Period, the Defendants were associated with, operated or controlled, the Fraud Enterprise, and the Defendants participated in the operation and management of the affairs of the Fraud Enterprise, through a variety of actions described herein. The Defendants participation in the Fraud Enterprise is necessary for the successful operation of the Defendants scheme.

423.     As a result, the Plaintiff and Class Members have suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including but not limited to civil litigation loss, occupational harm, reputational harm, lower value of shareholder holdings, lower return on investments.

424.     As a result, the Defendants gained ill-gotten wealth from fees collected from the Fidelity Funds from assets and accounts gathered through unfair business competition.

## COUNT II

### Violations of CIVIL RICO: 18 U.S.C. § 1962(b)

425.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

426.    This cause of action assets claims against the Defendants for violations of 18 U.S.C. § 1962(b) that the Defendants through a pattern of racketeering activity maintained, directly or indirectly control of the "Fidelity Investments Fraud Enterprise" which is engaged in activities of which affect interstate commerce.

427.    During the Class Period, the Defendants, Plaintiff, and Members of the Class, were and are each a "person" as that term is defined in 18 U.S.C. § 1961(3).

428.    During the Class Period, Plaintiff, and each member of the Class, were and are each a "person inured in his or her business or property by reason of violation of" RICO within the meaning of 18 U.S.C. § 1964(c).

429.    During the Class Period, the Defendants were, and are, a "person" who conducted the affairs of the "Fidelity Investments Fraud Enterprise" described below, through the "pattern of racketeering activity" described below. While the Defendants participates in the Fidelity Investments Fraud Enterprise, it has an existence separate and distinct from the enterprise. Further, the Fidelity Investments Fraud Enterprise is separate and distinct form the "pattern of racketeering activity" in which the Defendants has engaged and is engaging.

430.    During the Class Period, the Defendants were associated with, operated or controlled, the Fraud Enterprise, and the Defendants participated in the operation and management of the affairs of the Fraud Enterprise, through a variety of actions described herein

and unlawful under 18 U.S.C. 1961. The Defendants participation in the Fraud Enterprise is necessary for the successful operation of the Defendants scheme.

431.    As a result, the Plaintiff and Class Members have suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including but not limited to civil litigation loss, occupational harm, reputational harm, lower value of shareholder holdings, lower return on investments.

432.    As a result, the Defendants gained ill-gotten wealth from fees collected from the Fidelity Funds from assets and accounts gathered through unfair business practices.

## COUNT III

### Violations of CIVIL RICO: 18 U.S.C. § 1962(c)

433.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

434.    This cause of action assets claims against the Defendants for violations of 18 U.S.C. § 1962(c) for conducting the affairs of the "Fidelity Investments Fraud Enterprise" through a "pattern of racketeering activity."

435.    During the Class Period, the Defendants, Plaintiff, and Members of the Class, were and are each a "person" as that term is defined in 18 U.S.C. § 1961(3).

436.    During the Class Period, Plaintiff, and each member of the Class, were and are each a "person inured in his or her business or property by reason of violation of" RICO within the meaning of 18 U.S.C. § 1964(c).

437.    During the Class Period, the Defendants were, and are, a "person" who conducted the affairs of the "Fidelity Investments Fraud Enterprise" described below, through the "pattern of racketeering activity" described below. While the Defendants participates in the Fidelity

Investments Fraud Enterprise, it has an existence separate and distinct from the enterprise. Further, the Fidelity Investments Fraud Enterprise is separate and distinct form the "pattern of racketeering activity" in which the Defendants has engaged and is engaging.

438.    During the Class Period, the Defendants were associated with, operated or controlled, the Fraud Enterprise, and the Defendants participated in the operation and management of the affairs of the Fraud Enterprise, through a variety of actions described herein and unlawful under 18 U.S.C. 1961. The Defendants participation in the Fraud Enterprise is necessary for the successful operation of the Defendants scheme.

439.    As a result, the Plaintiff and Class Members have suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including but not limited to civil litigation loss, occupational harm, reputational harm, lower value of shareholder holdings, lower return on investments.

440.    As a result, the Defendants gained ill-gotten wealth from fees collected from the Fidelity Funds from assets and accounts gathered through unfair business competition.

## THE FIDELITY INVESTMENTS FRAUD ENTERPRISE (FIFE)

441.    The RICO Defendants and their conspirators are a group of persons associated together in fact for a common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint; namely through a multi-faceted campaign of lies, fraud, intimidation and official corruption, that resulted in the evasion of any substantive government investigation in 2007 and 2008 and which culminated in the loss of Ms. Lawson's personal civil lawsuit on November 14, 2017.

442.    The RICO Defendants and their conspirators are a group of persons associated together in fact for a common purpose of carrying out an ongoing criminal enterprise, as

described in the foregoing paragraphs of this Complaint; namely through a multi-faceted campaign of lies, fraud, intimidation and official corruption, to allow the Defendants to continue operating the Mass-Marketing Fraud and defrauding the Fidelity Funds' shareholders out of billions of dollars, by charging excessive servicing fees.

443.    Section 1961(4) of RICO defines an "enterprise" as any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

1.    The following groups, persons, and others presently unknown, have been members of and constitute an "enterprise" within the meaning of RICO, which are referred to collectively as the Fidelity Investment Fraud Enterprise (FIFE).

a.    The Defendants; Fidelity Investments.

b.    Fidelity Investments controlling Johnson family members; Edward Johnson III, and Abigail Johnson.

c.    The Fidelity Mutual Fund Board of Independent Trustees; including, but not limited to Marie Knowles.

d.    PricewaterhouseCoopers LLP.

e.    The United States Department of Labor and its Boston OSHA division.

f.    The United States Securities and Exchange Commission and its Boston Division.

g.    Various Fidelity Investments' employees, including attorneys in the general counsel; human resources representatives; specific named people in Ms. Lawson's Sarbanes Oxley claim, and relevant other current and past Fidelity employees, including, but not limited to Susan McSwain, Wendy Zazik, Colleen Hankins, Stacey Schmidt, Leslie Blickenstaff, Linda Stephenson, MaryEllen Walsh, Jean Raymond, Harris Komishane, Katherine Steed, Mike Freeman, Claire Cadogan, Betsy Connolly, Janice Smaga, JS Wynant, John Farinacci.

h.      Expert witness, Russell F. Peppet.

i.       Special Attendee "**important representative of the client**" to ex-parte meeting with the United States Department of Labor, mentioned by Eugene Scalia in FOIA document production.

j.      Attorney Eugene Scalia from the law firm Gibsun Dunne.

k.      Attorney William Kettlewell from then law firm Collora, and now currently Hogan Lovells US LLP.

l.       Attorney Victoria Steinberg from then law firm Collora, and now currently Todd and Weld LLP.

The Defendants are the operators of the FIFE.

444.    The FIFE is an association-in-fact within the meaning of 18 U.S.C. §1961(4) and consists of a group of "persons" associated together for the common purpose of employing the multiple deceptive, abusive, retaliatory, corruptive, and fraudulent acts described herein.

445.    The FIFE is an ongoing organization with an ascertainable structure, and framework for making and carrying out decisions, that functions as a continuing unit with established duties, and that is separate and distinct from the pattern of racketeering activity in which the Defendants has engaged and is engaging. The Fraud Enterprise was used as a tool to effectuate the pattern of racketeering activity.

446.    Fidelity's RICO enterprise conspiracy centers around schemes to defraud shareholders, for purposes of financial gain, by making false and fraudulent statements, misrepresentations, and promises, ultimately charging excessive servicing fees.

447.    Specifically, the Defendants, as the leader of the Fraud Enterprise, has worked with the FIFE conspirators, including but not limited to The Department of Labor, and The Securities and Exchange Commission, to obstruct justice among other things, and avoid any substantive investigation into the operations of the Mass-Marketing Fraud, thus allowing the Defendants to continue the deceptive practices described in this Complaint.

448.     The FIFE is an ongoing criminal enterprise that engages in, and whose activities affect, interstate commerce by among other things, conducting the Mass-Marketing Fraud, through aggressive marketing and advertising, misrepresentations through the issuance of Annual Fund Reports to hundreds of thousands of individuals throughout the United States, as described in this Complaint.

449.     The overarching purpose of the FIFE is for each of its members to profit directly, or indirectly from the wealth generated from the operation of the Mass-Marketing Fraud, and the income received from the billing of the Fidelity Funds for excessive fees.

## COUNT IV

### Violations of CIVIL RICO: 18 U.S.C. § 1962(d)

450.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

451.     This cause of action assets claims against the Defendants for violations of 18 U.S.C. § 1962 (d) for conspiring to violate subsection (a) of 18 U.S.C. § 1962.

452.     This cause of action assets claims against the Defendants for violations of 18 U.S.C. § 1962 (d) for conspiring to violate subsection (b) of 18 U.S.C. § 1962.

453.     This cause of action assets claims against the Defendants for violations of 18 U.S.C. § 1962 (d) for conspiring to violate subsection (c) of 18 U.S.C. § 1962.

454.     During the Class Period, the Defendants, Plaintiff, and Members of the Class, were and are each a "person" as that term is defined in 18 U.S.C. § 1961(3).

455.     During the Class Period, Plaintiff, and each member of the Class, were and are each a "person inured in his or her business or property by reason of violation of" RICO within the meaning of 18 U.S.C. § 1964 (c).

456.     During the Class Period, the Defendants were, and are, a "person" who conducted the affairs of the "Fidelity Investments Fraud Enterprise" described below, through the "pattern of racketeering activity" described below. While the Defendants participates in the Fidelity Investments Fraud Enterprise, it has an existence separate and distinct from the enterprise. Further, the Fidelity Investments Fraud Enterprise is separate and distinct form the "pattern of racketeering activity" in which the Defendants has engaged and is engaging.

457.     During the Class Period, the Defendants were associated with, operated or controlled, the Fraud Enterprise, and the Defendants participated in the operation and management of the affairs of the Fraud Enterprise, through a variety of actions described herein and unlawful under 18 U.S.C. 1961. The Defendants participation in the Fraud Enterprise is necessary for the successful operation of the Defendants scheme.

458.     The Defendants conspired with the "Fidelity Investments Fraud Enterprise" within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(a), that is, the Defendants conspired with the "Fidelity Investments Fraud Enterprise" that income would be received, directly, or indirectly, from a pattern of activity under 18 U.S.C. § 1961(1)(B) in which the Defendants participated as principals within the meaning of 18 U.S.C. §§ 1961(1), 1961(3), 1961(4), 1961(5), and 1962(a), to wit: multiple, repeated, and continuous violations described herein.

459.     The Defendants conspired with the "Fidelity Investments Fraud Enterprise" within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(b), that is, the Defendants conspired with the "Fidelity Investments Fraud Enterprise" to maintain, directly or indirectly control of the "Fidelity Investments Fraud Enterprise" which is engaged in activities of which

affect interstate commerce, through a pattern of racketeering activity, which is unlawful under 18 U.S.C. § 1961 to wit: multiple, repeated, and continuous violations described herein.

460.    The Defendants conspired with the "Fidelity Investments Fraud Enterprise" within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962 (c), that is, the Defendants conspired with the "Fidelity Investments Fraud Enterprise" to conduct the affairs of the "Fidelity Investments Fraud Enterprise" through a "pattern of racketeering activity" which is unlawful under 18 U.S.C. § 1961 to wit: multiple, repeated, and continuous violations of described herein.

461.    As a result, the Plaintiff and Class Members have suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including but not limited to occupational harm, reputational harm, lower value of shareholder holding, lower return on investments.

462.    As a result, the Defendants gained ill-gotten wealth from fees collected from the Fidelity Funds from assets and accounts gathered through unfair business competition.

## THE PATTERN OF RACKETEERING ACTIVITY

463.    As set forth herein, the Defendants has engaged in a "pattern of racketeering activity' as defined in 18 U.S.C. § 1961(5) by committing or conspiring to commit at least two acts of racketeering activity described herein, the last of which occurred within 10 years after the commission of a prior act of racketeering activity.

464.    The racketeering acts committed by the FIFE and described herein pose a threat of continued racketeering activity because they are part of a long-term association that exists for criminal purposes and are a regular way of conducting the Defendants'' ongoing legitimate business.

## RICO PREDICATE OFFENSES

465.    The pattern of racketeering activities . . . the RICO predicate offenses . . . are surreptitiously orchestrated by the "enterprise" to create insuperable barriers to allow Fidelity investments to evade justice and continue operating the RICO "enterprise," thus, enabling the FIFE to continue to harm the Class Members, Ms. Lawson, and all others similarly situated.

466.    The FIFE, by the pattern of racketeering activities detailed below, poses a serious threat to the democratic process of the United States. Fidelity Investments, the largest 401k provider in the United States, invests some of the proceeds from the Mass-Marketing Fraud with the intent to create a monopoly "to own" the 401K business in America.

467.    The RICO offenses described below are the direct or proximate cause of the Plaintiff's and the Class Members' injury.

## PREDICATE OFFENSES: (MAIL AND WIRE FRAUD)

## 1341 and 1343

468.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

469.    Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act indictable under the provisions of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

470.    As set forth below, to carry out, or attempt to carry out its scheme to defraud, the Defendants have engaged in, an continues to engage in, the affairs of the Fraud Enterprise through the following pattern of racketeering activity, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

471.    On belief the Defendants had a legal, professional and contractual duty to disclose relevant information to the Fidelity Mutual Fund Board of Trustees, and to the Fidelity Funds' shareholders.

472.    The Defendants in violation of 18 U.S.C. § 1341, placed in post offices and official depositories of the United States Postal Service matter and things to be delivered by postal Service, including but not limited, The Fidelity Fund's Annual Fund Reports.

473.    The Defendants in violation of 18 U.S.C. § 1343, transmitted and continue to transmit by internet connection The Fidelity Fund's Annual Fund Reports.

474.    Upon information and belief, Plaintiff alleges that The Defendants made misrepresentations in the Fidelity Fund's Annual Fund Reports. as abiding by a Code of Conduct, including but not limited to the following:

"Fidelity's profitability methodology are reasonable in all material respects."

"The Board considered the costs of the services provided by and the profits realized by Fidelity in connection with the operation of the fund and determined that the amount of profit is a fair entrepreneurial profit for the management of the fund."

475.    The Defendants in violation of 18 U.S.C. § 1343, transmitted matters and things relating to its uniform deceptive national advertising and marketing campaign including, the wide-spread advertising of the misrepresented free investment advice in various news media, including three main television commercials, and within its website.

476.    Upon information and belief, Plaintiff alleges that through present, on its website, The Defendant made misrepresentations as abiding by a Code of Conduct, including but not limited to the following:

<u>The Advantage of Investing with us</u>

We believe in making the complex, simpler – whether you work with us in person, on the phone, or online. From investing to financial planning and pricing, our goal is to be straightforward and help with your unique needs.

Straightforward Pricing
With no minimums to invest, no annual fees, and competitive pricing on trades and transactions, you'll always know what you're paying.

477.     The Defendants violated, and continues to violates 15 U.S.C. § 80b-6 – Prohibited

transactions by investment advisers. "It shall be unlawful for any investment adviser by use of

the mails or any means or instrumentality of interstate commerce, directly or indirectly –

1)     To employ any device, scheme, or artifice to defraud any client or prospective client;

2)     To engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

478.     In furtherance of their scheme to obstruct justice the Defendants electronically

filed and service court papers containing false and misleading statements intended to impede the

operation of this Court, including but not limited to the Defendants Statement of Facts.

## PREDICATE OFFENSE: (OBSTRUCTION OF JUSTICE)

## 1503

479.     Plaintiff realleges and incorporates by reference the allegations contained in the

preceding paragraphs as if fully set forth herein.

480.     Section 1961(1) of RICO provides that "racketeering activity" is, among other

things, any act indictable under the provisions of 18 U.S.C. § 1503 (obstruction of justice).

481.     The Defendants committed obstruction of justice by corruptly influencing,

obstructing, and impeding, and endeavoring to influence, obstruct, and impede, the due

administration of justice in the Lawson lawsuit filed and litigated in federal courts in violation of

18 U.S.C. § 1503, including, but not limited to the following:

482.     The SEC's actions in withholding 159 pages of documents relevant to Ms.

Lawson claims against the Defendants constitutes a charge of obstruction of justice in violation

of 18 U.S.C. § 1503.

    i.    The SEC purposely withheld FOIA documents prior to the First Circuit
Judgement; documents that by law Ms. Lawson could have forwarded to
the court to strengthen her argument for attorney fees.

    ii.    The SEC was informed of the proceeding when Ms. Lawson made the
FOIA request.

    iii.    The SEC had corrupt intent to interfere with the proceeding because they
intentionally waited until after the judgement to rescind their promise to
Ms. Lawson that they will proceed with her request.

483.     Upon information and belief, Plaintiff alleges that The Defendants withheld

critical information during the <u>Lawson</u> litigation in violation of 18 U.S.C. § 1503, including but

not limited to the following:

    i.    The Defendants outright refusal to produce the <u>Lawson</u> Litigation Hold
Letter which also violated Fed. R. Civ. P. Rule 37, Rule 26(a)(1)(A)(i),
Rule 34 (a)(1)(A).

    ii.    Spoliation - Withholding critical documents – Stephenson/Hock
investigation; Emails received by Ms. Lawson's on her last day of
employment, violated 18 U.S.C. § 1512(a)(1)(B):

## **PREDICATE OFFENSE: (WITNESS TAMPERING)**

## **1512 and 1513(e)**

484.     Plaintiff realleges and incorporates by reference the allegations contained in the

preceding paragraphs as if fully set forth herein.

485.     Section 1961(1) of RICO provides that "racketeering activity" is, among other

things, any act indictable under the provisions of 18 U.S.C. § 1512 (witness tampering).

486.     The Defendants committed witness tampering by corruptly influencing,

obstructing, and impeding, and endeavoring to influence, obstruct, and impede, the due

administration of justice in the Lawson lawsuit filed and litigated in federal courts in violation of

18 U.S.C. §§ 1512 and 1513(e), including, but not limited to the following:

487.    The FIFE committed five acts of Witness Tampering in violation of 18 U.S.C. §

1512(a)(1)(A):

   i.    Leslie Blickenstaff's call to Judith Anderson
   ii.   Leslie Blickenstaff's call to Agnes Connors
   iii.  Attorney Victoria Steinberg attempted intimidation of Ms. Anderson at her
         deposition
   iv.   Erik Olsson's refusal to testify at trial
   v.    Joe Guinta's refusal to testify at trial

488.    Section 1961(1) of RICO provides that "racketeering activity" is, among other

things, any act indictable under the provisions of 18 U.S.C. § 1513(e) (witness retaliation).

489.    The retaliation against Ms. Lawson after she made claims against the Defendants

to the Department of labor and The Securities Exchange and Commission constitutes a violation

of 18 U.S.C. § 1513(e) (witness retaliation).

490.    Section 1513(e) was added by the Sarbanes Oxley Act, which makes retaliation

against whistleblowers a crime and a RICO predicate offense. This provision allows

whistleblowers to sue for treble damages under the RICO statute.

## PREDICATE OFFENSE: VIOLATION OF THE SARBANES-OXLEY ACT OF 2002

## 1514A

491.    Plaintiff realleges and incorporates by reference the allegations contained in the

preceding paragraphs as if fully set forth herein.

492.    Section 1961(1) of RICO provides that "racketeering activity" is, among other

things, any act indictable under the provisions of 18 U.S.C. § 1514A.

493.    George W. Bush, 43rd president of the United States: 2001 – 2009, Statement on

Signing the Sarbanes-Oxley Act of 2002:

> Today I have signed into law H.R. 3763, "An Act to protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws, and for other purposes. The Act adopts tough new provisions to deter and punish corporate and accounting fraud and corruption, ensure justice for wrongdoers, and protect the interests of workers and shareholders.

> Several provisions of the Act require careful construction by the executive branch as it faithfully executes the Act.

> The legislative purpose of sections 302, 401, and 906 of the Act, relating to certification and accuracy of reports, is to strengthen the existing corporate reporting system under section 13(a) and 15(d) of the Securities Exchange Act of 1934. Accordingly, the executive branch shall construe this Act as not affecting authority relating to national security set forth in section 13(b) of the Securities Exchange Act of 1934.

> To ensure that no infringement on the constitutional right to petition the Government for redress of grievances occurs in the enforcement section of 1512(c) of title 18 of the U.S. Code, enacted by section 1102 of the Act, which among other things prohibits corruptly influencing any official proceeding, the executive branch shall construe the term "corruptly" in section 1512(c)(2) as requiring proof of a criminal state of mind on the part of the defendant.

> Given that the legislative purpose of section 1514A of title 18 U.S. Code, enacted by section 806 of the Act, is to protect against company retaliation for lawful cooperation with investigations and not to define the scope of investigative authority or to grant new investigative authority, the executive branch shall construe section 1415A(a)(1)(B) as referring to investigations authorized by the rules of the Senate or the House of Representatives and conducted for a proper legislative purpose.

> George W. Bush

> The White House, July 30. 2002.

494.    The Defendants violated 18 U.S.C. § 1512(c)(2), when they interfered with a

scheduled government investigation: "Whoever corruptly – otherwise obstructs, influences, or

impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned

not more than 20 years, or both."

495.     The provisions of 18 U.S.C. § 1514(A) states that employee protection provisions apply to companies with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and companies required to file reports under section 15(d) of the Securities Exchange Act of 1934.

496.     Fidelity Investments as contractors and/or subcontractors are required to file reports under section 15(d) of the Securities Exchange Act of 1934, and the Defendants are prohibited under 18 U.S.C. § 1514a from taking actions against their employees for whistle-blowing activity relating to potential fraud against the shareholders of the Fidelity Funds.

497.     The Supreme Court of the United States, in 2014, determined that all mutual fund companies including Fidelity Investments is a covered entity under The Sarbanes-Oxley Act of 2002.

498.     Section 806 of the Act protect employees such as Ms. Lawson who engaged in protected activity and as a result have been subjected to discharge, demotion, threats, harassment.

499.     The Sarbanes-Oxley Act was passed "To protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws, and for other purposes."

## PREDICATE OFFENSE: (OBSTRUCTING EXAMINATION OF FINANCIAL INSTITUTION)

## 1517

500.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

501.    Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act indictable under the provisions of 18 U.S.C. § 1517 (obstructing examination of financial institution).

502.    On belief the Defendants "compared notes" and met with the external auditors; PricewaterhouseCoopers to influence and possible dictate PwC's responses to the Securities Exchange and Commission investigation into Ms. Lawson's claims in violation of 18 U.S.C. § 1517.

## PREDICATE OFFENSE: (FALSE DECLARATIONS BEFORE GRAND JURY OR COURT)

## 1623

503.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

504.    Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act indictable under the provisions of 18 U.S.C. § 1623 (false declarations before grand jury or court).

505.    On belief the Defendants made false material declarations under oath in proceeding before this Court in connection with the Lawson lawsuit filed and litigated in federal courts, in violation of 18 U.S.C. § 1623(a).

## COUNT V

## PREDICATE OFFENSE: VIOLATION OF THE INVESTMENT ADVISERS ACT OF 1940

506.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

507.   Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act indictable under the provisions of the Investment Company Act of 1940.

508.   The Defendants violated Rule 38a-1 which requires that funds adopt and implement procedures that are reasonably designed to ensure compliance with the federal securities laws.

509.   The Defendants also violated The Advisers Act Rule 206(4)-7 requires that investment advisers adopt and implement procedures that are reasonably designed to ensure compliance with the federal securities laws.

510.   The Defendants violated Rule 38a-1 and Rule 206(4)-7, by bypassing the adopted procedures for implementing a major methodology in the 15(c) Process.

511.   The Defendants violated Rule 206 [80b-6], sections (1), (2) and (4) "It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly –

(1)   To employ any device, scheme, or artifice to defraud any client or prospective client;

(2)   To engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

('4)   To engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative."

512.   The Defendants violated Rule 206(4)-1 by advertising "free Guidance," which as of January 2006, is subsidized by the Fidelity Funds Shareholders, facilitated by the changing of the methodology that allocates almost half the operating costs of giving investment advice to the shareholders.

"Rule 206(4)-1 under the Advisers Act prohibits SEC-registered investment advisers from using any advertisement that contains any untrue statement of material fact or that is otherwise misleading. The rule broadly defines "advertisement" to include any notice, circular, letter, or other written communication addressed to more than one person, or any notice or other

announcement in any publication or by radio or television, that offers any investment advisory service."

"In addition, an advertisement may not: represent that any report, analysis, or service will be provided without charge unless the report, analysis, or other service will be provided without any obligation whatsoever."

Rule 206(4)-1(a) – It shall constitute a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of section 206(4) of the Act (15 U.S.C. 80b-6(4)) for any investment adviser registered or required to be registered under section 203 of the Act(15 U.S.C. 80b-3), directly or indirectly, to publish, circulate, or distribute any advertisement:

  3)  Which contains any statement to the effect that any report, analysis, or other services will be furnished free or without charge, unless such report, analysis or other service actually is or will be furnished entirely free and without any condition or obligation, directly or indirectly; or

  4)  Which contains any untrue statement of a <u>material</u> fact, or which is otherwise false or misleading.

## **COUNT VI**

## **PREDICATE OFFENSE: VIOLATION OF THE INVESTMENT COMPANY ACT**

## **OF 1940**

513.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

514.   Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act indictable under the provisions of the Investment Company Act of 1940.

515.   In addressing a fund company's perceived conflict of interest, the Investment Company Act of 1940 prohibits investment advisers such as the Defendants from imposing distribution costs on the mutual funds they operate. The act dictates that distribution cost should be paid by the fund advisers and/or the funds investors. The Defendants deceptively mischaracterize distribution expense as servicing expense in order to burden the shareholders with distribution expenses, while simultaneously advertising that a distribution activity; giving investment advice is "free."

## COUNT VII

## PREDICATE OFFENSE: VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

516.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

517.     Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act indictable under the provisions of the Securities Exchange Act of 1934.

## COUNT VIII

## BREACH OF FIDUCIARY DUTY

518.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

519.     Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act indictable under the provisions of section 36(b) of the Investment Company Act of 1940.

520.     The Defendants and the Fidelity Mutual Fund Board of Trustees violated, and continues to violate their owed fiduciary duties of undivided loyalty to its clients, the true owners of the Fidelity Mutual Funds, by violating the servicing contracts which allows the Defendants to charge excessive fees.

521.     The Defendants' violates their owed and promised fiduciary duty to their shareholders in the Fidelity Funds Annual Fund Reports, when the CFOs manipulates Board data by producing artificially lower margins so that the Defendants gain an advantage in the contract renewal process.

522.     Section 36(b) of the Act imposes fiduciary duty on an investment adviser with respect to compensation received for services provided to the mutual funds.

523.     Section 36(b) of the Act authorizes actions against the Defendants for breach of fiduciary duty by the Fidelity Funds' shareholders.

### (EXCESSIVE FEES FROM MASS-MARKETING FRAUD)

524.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

525.     Under section 36(b) of the Investment Company Act of 1940 as amended, 15 U.S.C. § 80A-3535(B), Fidelity Investments is deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by the Fidelity Funds.

526.     The Defendants and their conspirators actively orchestrated multiple schemes designed to benefit the Defendants at the expense of their shareholders in violation of their fiduciary duties.

527.     The marketing of "free" investment advice was specifically conducted to lure customers to do business with the Defendants who then charged the shareholders excessive service fees to subsidize the advertised 'free" investment advice.

528.     The "Guidance" methodology was specifically designed and changed with one objective . . . to lower profit margins, giving Fidelity Investments an advantage over their shareholders in the signing of the service contracts.

529.     The advantage gained by Fidelity Investments allowed Fidelity to received unwarranted fees and the Transfer Agent fees charged to the Fidelity Funds are excessive, and violate the Defendants' fiduciary duty to the Fidelity Funds shareholders.

530.     The Defendants have received and continue to receive excessive servicing fees attributable to the Mass-Marketing Fraud.

531.     The service fees charged by the Defendants are not within the range that would have been negotiated at arm's length in light of the surrounding circumstances.

532.     In charging and receiving excessive service fees, and failing to put the interests of the Fidelity Funds' shareholders ahead of their interest, the Defendants breached their statuary duties to the Fdielity Fund's shareholders.

533.     The Defendants and the Fidelity Mutual Fund Board of Trustees have breached and continue to breach their ICA § 36(b) fiduciary duty to the Fidelity Funds by charging and retaining these excessive fees.

## COUNT IX

## BREACH OF FIDUCIARY DUTY

## (ECONOMIES OF SCALE)

534.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

535.     Under section 36(b) of the Investment Company Act of 1940 as amended, 15 U.S.C. § 80A-3535(B), Fidelity Investments is deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by the Fidelity Funds.

536.     The Defendants have received and continue to receive excessive fees attributable to economies of scale that the Defendants do not share with the Fidelity Funds account holders.

## COUNT X

## BREACH OF CONTRACT

537.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

538.     The Defendants violates the legal and contractual obligations of the Transfer Agent Agreement Renewal between the Fidelity Funds and Fidelity Service Company by allocating to the Fidelity Funds operations costs for giving investment advice that the Fidelity Mutual Fund Treasury group determined is not covered under the contract.

## COUNT X

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

539.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

540.     A covenant of good faith and fair dealing of covered contract services is implicit all contracts.

541.     As a direct and proximate result of the Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff and Class Members have suffered damages in an amount to be determined at trial.

## COUNT XI AND XII

## VIOLATION OF THE SARBANES-OXLEY ACT OF 2002 AND THE DODD-FRANK ACT OF 2010

542.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

543.    Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act indictable under any offense involving fraud connected with a case under title 11 punishable under any law of the United States.

## COUNT XIII

## VIOLATION OF THE LANHAM ACT

## 15 U.S.C. 1125

544.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

545.    Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act indictable under any offense involving fraud connected with a case under title 11 punishable under any law of the United States.

546.    The Defendants violated and continues to violate 15 U.S.C. 1125 (Section 43 of the Lanham Act): False Designations of origin, false description, and dilution forbidden,

(a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which – (B) in commercial advertising or promotion, misrepresents that nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

547.    The Defendants have concealed, continues to knowingly conceal, and caused others to conceal, and has knowingly misrepresented, and cause others to misrepresent, information about the Mass-Marketing Fraud.

548.    The Defendants deceptive acts and practices are of a recurring nature directed at consumers.

549.    The Defendants deceptive acts and practices have a broad, uniform impact on consumers at large.

550.    The Defendants deceptive acts and practices are materially deceptive and misleading.

551.    The Plaintiff and Members of the Class have been injured, and are continuing to be injured, as a direct and proximate result of the Defendants' deceptive acts and practices.

## COUNT XIV

## VIOLATION OF MASSACHUSETTS STATE LAWS

552.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

553.    Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act chargeable under state laws.

554.    The Defendants have violated various state laws including but not limited to:

Mass. R. Prof. C. 3.3(a)(1) – Knowingly make a false statement of material fact.

Mass. R. Prof. C. 3.3(a)(3) – Knowingly use perjured testimony or false evidence.

Mass. R. Prof. C. 3.4(a) – Blocking Access to Evidence – May not actively suppress or hide material "having potential evidentiary value."

Mass. R. Prof. C. 3.4(f) – Evidence Tampering – may not procure the unavailability of evidence.

Mass. R. Prof. C. 3.5(d) –Witnesses – Shall not engage in any conduct that is intended to disrupt a proceeding.

Mass. R. Prof. C. 4.2 – If the opposing lawyer knows that the party is represented, the lawyer must refrain from direct communication about the subject matter of the representation.

Mass. R. Prof. C. 8.4(c) – Dishonest conduct.

555.     As described herein, the Defendants has engaged in unfair or deceptive acts or practices in the conduct of business, trade or commerce, or in the furnishing of services, that resulted in injury to the Plaintiff and Class Members.

556.     The Defendants have concealed, continues to knowingly conceal, and caused others to conceal, and has knowingly misrepresented, and cause others to misrepresent, information about the Mass-Marketing Fraud.

557.     The Defendants deceptive acts and practices are of a recurring nature directed at consumers.

558.     The Defendants deceptive acts and practices have a broad, uniform impact on consumers at large.

559.     The Defendants deceptive acts and practices are materially deceptive and misleading.

560.     The Plaintiff and Members of the Class have been injured, and are continuing to be injured, as a direct and proximate result of the Defendants' deceptive acts and practices.

## COUNT XV

## VIOLATION OF MASSACHUSETTS GENERAL LAWS

## CHAPTER 266, SECTION 30

561.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

562.     Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act chargeable under state laws. The Defendants violated Chapter 266, Section 30 of Massachusetts General Laws relating to Grand Larceny, specifically White Collar Crime caused by securities fraud.

563.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

564.    Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act chargeable under state laws relating to "Criminal Enterprise Activity." "The commission, attempt to commit or conspiracy to commit or the solicitation, coercion, aiding, abetting or intimidation of another to commit any of the following criminal activities under the laws of the commonwealth or equivalent crimes under the laws of any other jurisdiction; criminal harassment; subornation of perjury, witness intimidation, bribery; or any conduct defines as racketeering activity under Title 18, U.S.C. § 1961(1)(A)(B) and (D).

565.    As described herein, the Defendants has engaged in unfair or deceptive acts or practices in the conduct of business, trade or commerce, or in the furnishing of services, that resulted in injury to the Plaintiff and Class Members.

566.    The Defendants have concealed, continues to knowingly conceal, and caused others to conceal, and has knowingly misrepresented, and cause others to misrepresent, information about the Mass-Marketing Fraud.

567.    The Defendants deceptive acts and practices are of a recurring nature directed at consumers.

568.    The Defendants deceptive acts and practices have a broad, uniform impact on consumers at large.

569.    The Defendants deceptive acts and practices are materially deceptive and misleading.

570.    The Plaintiff and Members of the Class have been injured, and are continuing to be injured, as a direct and proximate result of the Defendants' deceptive acts and practices.

## <u>UNJUST ENRICHMENT - EXCESSIVE TRANSFER AGENT FEES</u>

571.    Plaintiff alleges that the Defendants breached their fiduciary duty under section 36(b) of the Investment Company Act of 1940 by charging excessive Transfer Agent Fees.

572.    Plaintiff contends that the Defendants gained and continue to gain unjust enrichment from the Mass-Marketing Fraud, and engaged and continue to engage in a civil conspiracy to cause the harm described herein against the Plaintiff and Class Members.

573.    Plaintiff contends that the "pure profits" from the Transfer Agent fees from 2006 to current time are excessive, illegal, and subject to disgorgement as alleged herein.

574.    The Defendants proceeds from the Mass-Marketing Fraud constitutes an "interest" in property that is subject to forfeiture under Section 1963(a)(1).

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff on behalf of herself and all others similarly situated, prays for judgment and relief on all Counts against the Defendants, as follows:

A.    That an Order be entered certifying that the action may be maintained as a class action;

B.    That temporary or preliminary injunctive relief be granted, pending final adjudication and the ordering or permanent relief;

    a.    Enjoining the Defendants from pursuing the policies, acts, and practices complained of herein; and

    b.    Providing restitution to all customers who were subjected to the Defendants wrongdoing;

c.     That permanent injunctive relief be granted enjoining the Defendants from pursing the policies, acts, and practices complained of herein and ordering restitution to customers;

d.     That judgment be entered against the Defendants for compensatory damages, including treble damages for Civil RICO as provided by 18 U.S.C. § 1964(c);

e.     The Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, and because of the reprehensible and outrageous nature of these acts, the Plaintiff and Class Members are entitled to, and should be awarded punitive damages against the Defendants.

f.     That reasonable attorney fees be awarded;

g.     That costs of this litigation be awarded; and

h.     That such other and further relief as the Court may deem necessary or appropriate be ordered.

Dated: May 31, 2019

Respectfully submitted,

/s/ *Jackie Hosang Lawson*

Jackie Hosang Lawson, *Pro Se*
27 Kilsyth Road
Brookline, MA 02445
(617) 739-4088
Jackielaw88@ comcast.net

118

## CERTIFICATE OF SERVICE

I hereby certify that on this thirty-first day of May 2019, I have served a copy of the

within Complaint by priority mail, postage prepaid upon:


Fidelity Investments
FMR LLC, FMR Corp., Fidelity Brokerage Services, LLC
245 Summer Street
ZW9A
Boston, MA 02110
(800) 343-3548

Fidelity Investments
FMR LLC, FMR Corp., Fidelity Brokerage Services, LLC
200 Seaport BLVD
Boston, MA 02110
(800) 343-3548


/s/, *Jackie Hosang Lawson*

Jackie Hosang Lawson, *Pro Se*
27 Kilsyth Road
Brookline, MA 02445
(617) 739-4088
Jackielaw88@ comcast.net